PEOPLE v WAGNER

Docket No. 48811. Submitted May 7, 1981, at Lansing.—Decided April 5, 1982.

Charles D. Wagner was convicted of armed robbery and possession of a firearm during the commission of a felony in Jackson Circuit Court, James M. Justin, J. The defendant appeals alleging that: (1) the trial court erred in admitting into evidence two rifles, ammunition and two ski masks used in the robbery which were obtained during a search without a warrant of a townhouse in which the defendant was residing; (2) the trial court erred in admitting his two confessions into evidence because the confessions were the fruit of an illegal search and thus inadmissible; and (3) the trial court erred in denying his motion, made on the day scheduled for trial, to withdraw a prior waiver of trial by jury. *Held:*

1. The weapons, ammunition and ski masks introduced at trial were the fruits of an illegal search and should not have

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 68 Am Jur 2d, Searches and Seizures §§ 2, 35, 46.
Validity, under Federal Constitution, of consent to search Supreme Court cases. 36 L Ed 3d 1143.
[2, 9, 11] 16A Am Jur 2d, Constitutional Law § 601.
68 Am Jur 2d, Searches and Seizures §§ 2, 4.
[4] 68 Am Jur 2d, Searches and Seizures § 13.
Admissibility, in criminal case, of evidence obtained by search by private individual. 36 ALR3d 553.
[5] 29 Am Jur 2d, Evidence § 425.
68 Am Jur 2d, Searches and Seizures § 62.
Review on appeal by United States under 18 USCS § 3731 of orders suppressing, or excluding evidence, or for return of seized property. 34 ALR Fed 617.
[6] 29 Am Jur 2d, Evidence §§ 529, 542, 543, 546, 555, 588.
[7] 21 Am Jur 2d, Criminal Law §§ 677, 900.
47 Am Jur 2d, Jury §§ 67, 70.
Withdrawal of waiver of right to jury trial in criminal case. 46 ALR2d 919.
[8] 68 Am Jur 2d, Searches and Seizures § 16.
[10, 13] 68 Am Jur 2d, Searches and Seizures § 44.
[12] 68 Am Jur 2d, Searches and Seizures § 49.

been admitted. The evidence established that the defendant had a legitimate expectation of privacy in the townhouse and could challenge the search. A party's leading the police officers to the location of the articles that were seized does not validate the search since he did not have a sufficient relationship to the premises to consent to the search. There is no evidence that the police could have reasonably believed that the party had common authority over the premises. Further, the police should not be allowed to avoid the constitutional limitations imposed upon them by claiming that the acts of a private party were also involved in revealing where the articles were located.

2. The trial court's decision to admit the defendant's confessions was erroneous. There was a close temporal proximity between the illegal seizure of the evidence and the giving by the defendant of the incriminating statements. The first statement made by the defendant occurred after the police officers emerged from the townhouse with the illegally seized evidence. Thus, that confession was the fruit of the illegal search and seizure. The second confession was made less than one hour after the first statement was given, with the only intervening event of significance being a third recitation to the defendant of his *Miranda* rights. There were no intervening events to purge the defendant's second confession of the taint caused by the illegal seizure of the evidence.

3. The trial court did not abuse its discretion in denying the defendant's motion to withdraw his waiver of a jury trial. The defendant's request for a jury trial after his prior waiver was made as part of a general attempt to delay the trial so that the case could be heard before a particular judge.

4. The Court of Appeals cannot say that the trial court's errors were harmless beyond a reasonable doubt in light of the lack of properly admitted evidence supporting the defendant's guilt. The defendant's convictions should be reversed and the case remanded for a new trial.

BRONSON, J., concurred. He believes that the defendant had a sufficient expectation of privacy in the townhouse to warrant standing to object to the search without a warrant. He believes that the police officers abused their powers when they searched the premises on the authority of a party who they knew did not reside on the premises. That party did not have the right to consent to the search. Further, exigent circumstances did not exist justifying the search without a warrant. He believes that the Court of Appeals refusal to reverse this conviction and suppress the evidence in issue would affirmatively undermine the right of our citizens to be free from unreasonable searches

and seizures. He concurs in reversing the defendant's convictions.

Reversed and remanded.

R. M. Daniels, J., dissented. He believes that the seizure of the evidence from the home not owned by the defendant made after consent by a party with apparent authority to give consent was not an illegal search and seizure. He believes that the party giving consent had a sufficient relationship to the property inspected to give valid consent to search the premises. He believes that there were sufficient exigent circumstances to validate the search without a warrant. Further, he believes that the dangerous quality of the weapons should be a factor to be weighed in favor of admitting them into evidence. He feels that the defendant did not possess a sufficient interest in the area searched to give him a legitimate expectation of privacy. The two major concerns of the Fourth Amendment, the right to privacy and the prevention of abuse of power by government officials, were adequately protected. He would affirm the defendant's convictions.

Opinion of M. J. Kelly, P.J.

1. Searches and Seizures — Consent.

A search and seizure without a warrant is unreasonable per se and violates the Fourth and Fourteenth Amendments of the United States Constitution and the Michigan Constitution unless shown to be within one of the exceptions to the warrant requirement; the burden of proof is always on the state to show that an exception exists; whether a valid consent to search was given is a question of fact and the Court of Appeals will not reverse a trial court's finding concerning consent unless it is clearly erroneous (US Const, Am IV, XIV; Const 1963, art 1, § 11).

2. Searches and Seizures — Expectation of Privacy.

A defendant must demonstrate that his Fourth Amendment rights have been violated when challenging a search and seizure of evidence; an analysis of whether a defendant's Fourth Amendment rights have been violated should not focus on arcane distinctions developed in property or tort law, but on whether the defendant had a legitimate expectation of privacy in the place searched (US Const, Am IV).

3. Searches and Seizures — Consent.

A search conducted pursuant to a valid consent to search is constitutionally permissible; a search is also valid if the permis-

sion to search was obtained from a third party who possessed common authority over, or other sufficient relationship to, the premises or effects sought to be inspected.

4. Searches and Seizures — Acts of Private Parties.

The police cannot avoid the constitutional limitation imposed upon them in conducting a search of a premises without a warrant by claiming that the acts of a private party are also involved in indicating the location of items subsequently seized where there has been affirmative participation by government officials in obtaining the evidence during the search.

5. Appeal — Criminal Law — Evidence.

A trial court's determination relative to the suppression of evidence obtained through an allegedly illegal search and seizure will not be overturned unless that determination is found to be clearly erroneous.

6. Criminal Law — Confessions — Evidence.

The question of whether a confession is the product of a free will as opposed to being tainted by antecedent illegality for purposes of suppressing that confession under the Fourth Amendment must be answered on the facts of each case, with no single fact being dispositive; in determining whether a confession was obtained by exploitation of an illegal arrest, the giving of *Miranda* warnings by the police is an important factor, but the temporal proximity of the arrest and confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct are all relevant, with the voluntariness of the statement a threshold requirement; the burden of showing admissibility is on the prosecution.

7. Criminal Law — Waiver — Jury Trial.

A defendant in a criminal case who waives his right to trial by a jury should not be allowed to later withdraw the waiver when the case is ready for trial where, absent additional factors, the attempt to withdraw the waiver is part of a general attempt to delay the trial.

### Concurrence by Bronson, J.

8. Searches and Seizures — Standing.

*A criminal defendant who is a resident of a premises that has been searched by police without a warrant but not a named lessee of the premises has a substantial legal interest in the*

*premises conferring upon him standing to challenge the search of the premises without a warrant.*

9. Searches and Seizures — Expectation of Privacy.

*A criminal defendant should be considered as having a reasonable expectation of privacy in a premises sufficient to object to a search of the premises without a warrant where he has free run of the premises, clothing on the premises, and answers the door when the police arrive.*

10. Searches and Seizures — Exigent Circumstances.

*There must be an imminent danger of destruction or concealment of evidence for a search without a warrant to be valid based on the existence of exigent circumstances.*

Dissent by R. M. Daniels, J.

11. Constitutional Law — Fourth Amendment.

*The basic purpose of the Fourth Amendment to the United States Constitution is to safeguard the privacy and security of individuals against arbitrary invasions by government officials (US Const, Am IV).*

12. Searches and Seizures — Consent.

*The prosecuting attorney by establishing that permission to search a premises was given by a third party who had a sufficient relationship to the effects inspected may justify a search by police officials without a warrant.*

13. Searches and Seizures — Exigent Circumstances.

*The exigent circumstances exception to the requirement that a search warrant be obtained before searching a premises provides that if an officer has probable cause to believe that a search of a certain place will produce specific evidence of a crime there is no need for a warrant if a search without a warrant is necessary to protect the officers, prevent the loss or destruction of evidence or prevent the escape of the accused.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Edward J. Grant,* Prosecuting Attorney, and *John L. Wildeboer,* Assistant Prosecuting Attorney, for the people.

*Terence R. Flanagan,* Assistant State Appellate Defender, for defendant on appeal.

Before: M. J. Kelly, P.J., and Bronson and R. M. Daniels,* JJ.

M. J. Kelly, P.J. Defendant Charles David Wagner appeals as of right his convictions for armed robbery, MCL 750.529; MSA 28.797, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). The defendant's conviction was entered at the conclusion of a bench trial held before acting Jackson County Circuit Court Judge James M. Justin, and was based upon charges stemming from the April 9, 1979, robbery of the Kwick Shop Party Store in Pleasant Lake. The robbery was allegedly committed by the defendant and an accomplice, Steven Hartranft. In a separate proceeding, Hartranft pled guilty to identical charges. Defendant raises three issues.

## I

The defendant first argues as reversible error the lower court's decision not to suppress from evidence two rifles, ammunition, and two ski masks used in the robbery, which were allegedly obtained during an illegal search without a warrant of a townhouse in which the defendant was residing. The disputed search was conducted with the consent of Hartranft, who was arrested with the defendant and questioned just outside of the residence. At the conclusion of the hearing on the suppression of the evidence the trial court concluded that the facts disclosed no search at all since Hartranft had led the investigating officers to the attic in which the evidence was hidden.

A search and seizure without a warrant is un-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

reasonable per se and violates the Fourth and Fourteenth Amendments of the United States Constitution and Const 1963, art 1, § 11, unless shown to be within one of the exceptions to the rule. *People v Reed,* 393 Mich 342, 362; 224 NW2d 867 (1975), *cert den* 422 US 1044, 1048 (1975). The burden of proof is always on the state to show that an exception exists. *Id.,* 362. Whether a valid consent was given is a question of fact, and this Court will not reverse a trial court's finding concerning consent unless it is clearly erroneous. *People v Whisnant,* 103 Mich App 772, 776; 303 NW2d 887 (1981), *lv den* 411 Mich 960 (1981).

When challenging a search and seizure, a defendant must demonstrate that his Fourth Amendment rights have been violated. *Rakas v Illinois,* 439 US 128, 134; 99 S Ct 421; 58 L Ed 2d 387 (1978). An analysis of whether defendant's Fourth Amendment rights have been violated does not focus on arcane distinctions developed in property or tort law, but on whether defendant had a legitimate expectation of privacy in the place searched. *Id.,* 143. See also *United States v Salvucci,* 448 US 83; 100 S Ct 2547; 65 L Ed 2d 619 (1980), *Rawlings v Kentucky,* 448 US 98; 100 S Ct 2556; 65 L Ed 2d 633 (1980).

The evidence presented at the preliminary examination demonstrated that defendant was living in the townhouse which was rented by his girlfriend. Although he did not pay rent or utilities, he did sometimes pay for groceries. Defendant had been a full-time resident of the townhouse for approximately four months. While defendant occasionally stayed at his parents' house, the evidence established that he had a legitimate expectation of

privacy in the townhouse and could challenge the search.

On appeal, the prosecutor seeks to justify the search by claiming that Hartranft consented to the search. A search pursuant to a valid consent is constitutionally permissible. *Schneckloth v Busta-monte,* 412 US 218, 219, 222; 93 S Ct 2041; 36 L Ed 2d 854 (1973). A search is also valid if the permission to search was obtained from a third party who possessed common authority over, or other sufficient relationship to, the premises or things sought to be inspected. *United States v Matlock,* 415 US 164, 171; 94 S Ct 988; 39 L Ed 2d 242 (1974). The Court explained common authority:

"Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see *Chapman v United States,* 365 US 610; 5 L Ed 2d 828; 81 S Ct 776 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v California,* 376 US 483; 11 L Ed 2d 856; 84 S Ct 889 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.,* 172, fn 7.

However, the Supreme Court expressly left open the question of whether a search without a warrant may be sustained merely upon a showing that the searching officers reasonably, albeit errone-

ously, believed that the consenting party had sufficient authority over the premises to permit the search. *Id.,* 177, fn 14.

In *People v Adams,* 53 NY2d 1; 439 NYS2d 877; 422 NE2d 537 (1981), the Court of Appeals of New York addressed the issue of whether an officer's reasonable belief was sufficient to justify the search without a warrant. In that case, a police officer, after being shot at by the defendant, was approached by the defendant's girlfriend, who led the police to the defendant's apartment. She unlocked the apartment door and led the police to a closet in which a rifle and ammunition were discovered. Upon leaving the apartment, the girlfriend informed police that she did not live in the apartment. The defendant tried to suppress the seized evidence but failed and appealed his conviction to the Court of Appeals. Initially, the court rejected the state's argument that the girlfriend, a private individual, had conducted the search and therefore the Fourth Amendment had not been violated. *Id.,* 7. Examining the issue of whether the police officer's reasonable belief that the woman could consent to the search could justify it, the court wrote:

"We would agree that where the searching officers rely in good faith on the apparent capability of an individual to consent to a search and the circumstances reasonably indicate that that individual does, in fact, have the authority to consent, evidence obtained as the result of such a search should not be suppressed. * * * We emphasize that the police belief must be reasonable, based upon an objective view of the circumstances present and not upon the subjective good faith of the searching officers. Moreover, a warrantless search will not be justified merely upon a bald assertion by the consenting party that they possess the requisite authority. Nor may the police proceed without making some

inquiry into the actual state of authority when they are faced with a situation which would cause a reasonable person to question the consenting party's power or control over the premises or property to be inspected. In such instances, bare reliance on the third party's authority to consent would not be reasonable and would, therefore, subject any such search to the strictures of the exclusionary rule." *Id.*, 9.

The court concluded that the officer had a reasonable belief that the woman could consent to the search. *Id.*, 11.

In this case, on April 10, 1979, the police arrived at the townhouse of Jacalyn Whiting, defendant's girlfriend, where they found the defendant and Hartranft. The two men were taken to different police cars and questioned about certain armed robberies. After Hartranft admitted participating in the robberies, he told the officer that the weapons used in the robberies were in the townhouse. Hartranft proceeded into the house followed by a police officer. He led the officer to a bedroom closet where the officer found the weapons hidden in a crawl space.

At the time of the search, the police did not know who rented the townhouse. When they asked Hartranft if he lived in the townhouse, Hartranft indicated only that defendant's girlfriend rented the townhouse. At the preliminary examination the officer in charge of the search admitted that it was not Hartranft's residence. The record is devoid of any evidence that supports a finding that the police could reasonably believe that Hartranft had common authority over or other sufficient relationship to the premises to justify a belief that he could consent to a search.

We likewise reject the trial court's reasoning that Hartranft and not the police searched the

townhouse. While Hartranft did show the police where the weapons were located, he was in police custody at the time and had just confessed to armed robbery. Furthermore, the police officer actually searched the crawl space and seized the weapons. Where, as here, there has been affirmative participation by government officials in obtaining evidence, the police cannot avoid the constitutional limitations imposed upon them by claiming that the acts of a private party are also involved. *Adams, supra,* 7.

The weapons, ammunition and ski masks introduced at trial were the fruits of an illegal search and should not have been admitted at the defendant's trial.

## II

The defendant next asserts that his confession, volunteered at the time investigating officers emerged from the townhouse with the rifles, ammunition and clothing, should have been ruled inadmissible at trial as a fruit of the illegal search. The panel in the prior *Wagner* case, raised but did not decide this issue *sua sponte.*[1] The facts pertinent to the defendant's confession were outlined in the following discussion:

"An issue that was argued below, but not raised by defendant's appellate counsel, is whether his confession resulted from an illegal search and seizure and should have been excluded as 'fruits of the poisonous tree'. See

---

[1] After reviewing the evidence properly admitted in the defendant's trial on the first charge, the Court concluded it was unnecessary to decide whether the confession was a fruit of the illegal search. The Court held that the remaining evidence implicating the defendant in the March 20, 1979, robbery was sufficient to render harmless any error arising from admission of the firearms and other materials found in the townhouse or the defendant's confession. *People v Wagner,* 104 Mich App 169; 304 NW2d 517 (1981).

*People v Roderick Walker,* 27 Mich App 609; 183 NW2d 871 (1970). The evidence indicated that defendant initially refused to make a statement and requested an attorney when questioned in a police car outside of the townhouse. When Hartranft and the two police officers emerged with the seized evidence, defendant changed his mind and, after waiving his *Miranda* rights, admitted his participation in the two armed robberies. He repeated the confession in a written statement later that day, again preceded by a waiver of his *Miranda* rights." *People v Wagner, supra,* 179-180.

We note that a decision of a trial court at a hearing on the suppression of evidence will not be reversed on appeal unless the decision is found to be clearly erroneous. *People v Erskin,* 92 Mich App 630; 285 NW2d 396 (1979).

Our inquiry into this question is guided by the United States Supreme Court's decisions in *Brown v Illinois,* 422 US 590; 95 S Ct 2254; 45 L Ed 2d 416 (1975), and its progeny. In *Brown,* a case said to lie at "the crossroads of the Fourth and the Fifth Amendments", *id.,* 420, the Court analyzed the admissibility of incriminating statements made after the defendant's arrest without probable cause, in violation of the Fourth Amendment. The Court relied on its prior decision in *Wong Sun v United States,* 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963), to hold that the giving of *Miranda*[2] warnings alone could not purge a confession of the primary taint brought about by the original illegal arrest. The test espoused in *Brown* to determine the voluntariness of a confession following an arrest violative of the Fourth Amendment was most recently summarized in *Rawlings v Kentucky,* 448 US 98, 106-107; 100 S Ct 2556; 65 L Ed 2d 633 (1980):

[2] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

"As we noted in *Brown v Illinois, [supra,]* where we rejected a 'but for' approach to the admissibility of such statements, 'persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality.' In *Brown* we also set forth the standard for determining whether such statements were tainted by antecedent illegality: ·

" 'The question whether a confession is the product of a free will * * * must be answered on the facts of each case. No single fact is dispositive. * * * The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant. The voluntariness of the statement is a threshold requirement. And the burden of showing admissibility rests, of course, on the prosecution.' 422 US 603-604; 45 L Ed 2d 416; 95 S Ct 2254 [1975] (footnotes and citations omitted). See also *Dunaway v New York,* 442 US 200, 218; 60 L Ed 2d 824; 99 S Ct 2248 (1979)."

See also *People v Solomon Washington,* 99 Mich App 330, 334-335; 297 NW2d 915 (1980), *lv gtd* 410 Mich 868 (1980), and *People v Martin,* 94 Mich App 649, 653-654; 290 NW2d 48 (1980), for cases applying the same test to assess the admissibility of confessions or statements made after otherwise illegal arrests.

We do not agree with the people that, based upon an argued distinction between an illegal arrest and an illegal seizure of evidence as the catalyst for subsequent incriminating statements, the above test to determine voluntariness is inapplicable in examining the voluntariness of this defendant's confession. See *United States v Ceccolini,* 435 US 268; 98 S Ct 1054; 55 L Ed 2d 268 (1978), retaining the general analytical framework

espoused in *Brown,* but holding that "the exclusionary rules should be invoked with much greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness than when a similar claim is advanced to support suppression of an inanimate object". *Id.,* 280; 55 L Ed 2d 279. Review of the *Ceccolini* majority's opinion discloses a similar view toward statements offered by a defendant;[3] thus, we are required to apply the *Brown*

---

[3] The majority reasoned:

"Evaluating the standards for application of the exclusionary rule to live-witness testimony in light of this balance, we are first impelled to conclude that the degree of free will exercised by the witness is not irrelevant in determining the extent to which the basic purpose of the exclusionary rule will be advanced by its application. *This is certainly true when the challenged statements are made by a putative defendant after arrest, Wong Sun, supra,* 491; 9 L Ed 2d 441; 83 S Ct 407; *Brown v Illinois, supra,* and *a fortiori* is true of testimony given by nondefendants.

"The greater the willingness of the witness to freely testify, the greater the likelihood that he or she will be discovered by legal means and, concomitantly, the smaller the incentive to conduct an illegal search to discover the witness. Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

\* \* \*

"Another factor which not only is relevant in determining the usefulness of the exclusionary rule in a particular context, but also seems to us to differentiate the testimony of all live witnesses—*even putative defendants*—from the exclusion of the typical documentary evidence, is that such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby. Rules which disqualify knowledgeable witnesses from testifying at trial are, in the words of Professor McCormick, 'serious obstructions to the ascertainment of truth'; accordingly, '[f]or a century the course of legal evolution has

standards to the instant facts.

Our inquiry thus directed, we hold that the trial court's decision to admit the defendant's confessions, despite the reservation to excluding statements of a live witness in *Ceccolini,* was in error. But applying the *Brown* standards to the defendant's first confession, we find that there was a close temporal proximity between the illegal seizure of evidence and the incriminating statements. The evidence discloses that the defendant first requested an attorney upon being questioned in a squad car outside of his residence. At that juncture the questioning ceased, except for a discussion initiated by the defendant concerning possible penalties for armed robbery. Only when investigating officers emerged from the residence with the illegally seized weapons did the defendant indicate his desire to discuss the circumstances of the offense. Further, there is no evidence in the record of intervening circumstances between the seizure and confession. The defendant, upon seeing the weapons, immediately indicated his desire to discuss the offense for which he was charged. Finally, while the purpose of the seizure does not appear to have been aimed at extracting a confession from the defendant, the effect was a logical consequence. Balancing these factors, we conclude that the first confession was the fruit of the illegal search and seizure.

been in the direction of seeping away these obstructions.' C. McCormick, Law of Evidence, § 71 (1954). Alluding to the enormous cost engendered by such a permanent disability in an analogous context, we have specifically refused to hold that 'making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.' *United States v Bayer,* 331 US 532, 541; 91 L Ed 1654; 67 S Ct 1394 (1947)." *United States v Ceccolini, supra,* 276-278; 55 L Ed 2d 277-278. (Emphasis added; footnote omitted.)

III

A similar conclusion can be made with regard to the defendant's subsequent confession, given at the Michigan State Police Post in Blackman Township shortly after the first statement was made. The second statement was made by the defendant less than one hour after the first, and the only intervening event of significance was a third recitation of defendant's *Miranda* rights. Although the warnings given before the second confession was made would have been sufficient to purge the statement of any Fifth Amendment objections concerning voluntariness, *Brown v Illinois, supra,* 426, citing *Wong Sun, supra,* 486; 83 S Ct 407; 9 L Ed 2d 441 (1963), the same is not true for alleged illegalities grounded on the Fourth Amendment. In *Dunaway v New York,* 442 US 200, 218; 99 S Ct 2248; 60 L Ed 2d 824 (1979), the Supreme Court stated:

"The situation in this case is virtually a replica of the situation in *Brown.* Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance. Nevertheless, three members of the Appellate Division purported to distinguish *Brown* on the ground that the police did not threaten or abuse petitioner (presumably putting aside his illegal seizure and detention) and that the police conduct was 'highly protective of defendant's Fifth and Sixth Amendment rights,' 61 AD2d 303; 404 NYS2d 493. This betrays a lingering confusion between 'voluntariness' for purposes of the Fifth Amendment and the 'causal connection' test established in *Brown. Satisfying the Fifth Amendment is only the 'threshold' condition of the Fourth Amendment analysis required by* Brown. *No intervening events broke the connection between petitioner's illegal detention and his confession. To admit petitioner's confession in such a case would allow 'law enforcement officers to violate the Fourth Amendment*

*with impunity, safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth."* (Footnotes omitted; emphasis added.)

See also *People v Solomon Washington, supra,* 336, for a case in which a defendant's statement was sufficiently attenuated from his illegal arrest. In *Washington,* the defendant's confession was precipitated by the revelation of a legally obtained statement made by the defendant's sister to police. Here, there were no intervening events to purge the defendant's second confession of the taint caused by the illegal seizure herein. We hold that the statement was the fruit of an illegal search. Thus, the lower court erred in permitting the statement to be admitted.

## IV

The defendant's final allegation of error concerns the trial court's denial of a defense motion, offered on the day scheduled for trial, to withdraw the defendant's prior waiver of his right to a jury trial. On June 18, 1979, defendant executed both a written and oral waiver of jury trial and elected to be tried before Jackson County Circuit Court Judge Charles J. Falahee. By the August 13, 1979, trial date, however, District Judge Justin had been assigned to preside over defendant's trial because Judge Falahee was on vacation. After a number of motions designed to have the case heard by Judge Falahee and after two recesses, defendant indicated his desire to withdraw his jury waiver. Thereupon, the trial court made inquiries to determine the availability of a jury panel. Upon finding no panel available and because the lower court thought the motion was a delaying tactic to avoid trial, the motion was denied.

In *People v John Haddad,* 306 Mich 556, 559; 11 NW2d 240 (1943), the Supreme Court was presented with a question similar to that argued herein: "Did the [trial] court err in refusing to allow defendant the right to withdraw a waiver of a trial by jury when a request was made before any witnesses were called and sworn?" After the *Haddad* Court noted the statutory right of a defendant to waive his right to a jury, 3 Comp Laws 1929, § 17131 (Stat Ann § 28.856), since replaced by MCL 763.3; MSA 28.856, the Court held:

"At the opening of his trial before the court at that time, while discussing the lack of counsel, the defendant said 'I'd like to get a jury trial anyway.' To grant this request would have merely resulted in a continuance until a jury was present, at which time the defendant again might have waived a jury trial, as he would have the right to do. Carried to the extreme, such a procedure would delay trial indefinitely. With each change from jury to nonjury docket, or vice versa, the accused might reverse his position as a ruse to delay trial. In this case, six months had elapsed since the defendant had waived jury trial, and nearly a year since his arraignment. The orderly procedure of courts for the prompt trial of criminal cases does not require more than was done by the court in this case. Defendant's constitutional rights were not violated."

The standard of review to be applied to motions for withdrawal of jury waivers has not been previously decided by this Court. In this regard we note, however, the general rule summarized in 47 Am Jur 2d, Jury, § 67, pp 684-685:

"As a general rule, and apart from statutes limiting its authority, a court may permit the withdrawal of a waiver of the right to trial by jury, or on motion or request, set aside such a waiver, if the request is timely made, unless the waiver has been acted upon. Accord-

ing to some cases, once a waiver of jury trial has matured, the waiver may not be withdrawn at the instance of one party, although other cases have recognized that such a waiver may, for good cause, be withdrawn with the consent of the court. As a general rule, a waiver of a jury trial voluntarily and regularly made cannot afterward be withdrawn except in the discretion of the court." (Footnotes omitted.)

In our view, the trial court did not abuse its discretion in denying the defendant's motion to withdraw. Review of the record at trial discloses that the defendant's request for a jury, after his prior waiver, was made as part of a general attempt to delay trial so that the case could be heard before Judge Falahee. Absent additional factors, we do not view this rationale as adequate to support withdrawal of a prior waiver. The trial court thus did not abuse its discretion in denying the defendant's motion.

## V

We must finally determine whether the erroneous admission of the defendant's confessions and the articles seized at defendant's residence constituted error requiring reversal under the standards noted in *People v Robinson,* 386 Mich 551; 194 NW2d 709 (1972). In the first *Wagner* decision, this Court found the error arising from improper admission of the evidence seized at defendant's residence and "any error which may have occurred regarding the admissibility of defendant's confessions" to be harmless. Additional evidence supporting the conviction, which rendered harmless the errors committed by the trial court, was summarized in the following discussion:

"If we assume that the statements were inadmissible

along with the evidence seized in the townhouse, there was other evidence adduced at trial which supported defendant's conviction. Kenneth James Darnall, the party store clerk, identified defendant as one of the robbers. On cross-examination, he acknowledged that the robbers wore stockings over their faces, but claimed he could identify defendant because the stocking over defendant's face was clear. The trial judge indicated that Darnall's testimony alone was sufficient to support the conviction. However, we should note that a portion of this witness's testimony concerned one of the rifles seized from the townhouse attic. The testimony of defendant's girlfriend, Ms. Whiting, also supported the conviction. She stated that defendant told her that he had robbed the Party Pointe store and taken about $300." *People v Wagner, supra,* 180.

In this case, the properly admitted evidence is less supportive of the defendant's guilt. Unlike the first decision, the store clerk in this case was unable to identify either defendant. The sole testimony directly supporting a guilty verdict was that of the defendant's girlfriend, Jacalyn Whiting. At this trial, Whiting testified that the defendant and Hartranft returned to her home possibly around midnight, April 9, 1979, the date of the second robbery. Whiting related a conversation she had with defendant that night, during which the defendant said he and Hartranft "had just robbed a Quick Shop, or a party store at Pleasant Lake" and that "he (Wagner) was scared because he said he was pretty sure he was caught".

In light of the lack of properly admitted evidence supporting defendant's guilt in this case, we cannot say that the errors below were harmless beyond a reasonable doubt. The defendant's convictions are thus reversed and the case is remanded for a new trial.

Reversed and remanded.

BRONSON, J. *(concurring)*. I concur in Judge
KELLY's opinion in this case. However, various
aspects of the dissenting opinion compel me to
express my own views on the search and seizure
issue in some detail.

## I

### *Did defendant have a reasonable expectation of privacy in the area searched?*

The dissent obliquely finds that the defendant
was living in the searched townhouse, he had no
legal interest in the premises and, thus, no consti-
tutional right to privacy in the attic where the
evidence was seized. I believe that this position
surpasses in its restrictive vision of what is meant
by "an expectation of privacy in the premises
searched" anything contemplated or intended by
the United States Supreme Court holding in *Rakas
v Illinois,* 439 US 128; 99 S Ct 421; 58 L Ed 2d 387
(1978), which did away with the far more func-
tional rule of automatic standing propounded in
*Jones v United States,* 362 US 257; 80 S Ct 725; 4
L Ed 2d 697 (1960).

The testimony of Jacalyn Whiting at the hear-
ing on the suppression of evidence clearly reveals
that the defendant had a "reasonable expectation
of privacy in the premises" if this expression has
any meaning at all. Ms. Whiting testified that she
alone was the lessee of the townhouse. However,
defendant had been living with her for three or
four months. The pair would occasionally argue
and on these occasions defendant might stay else-
where. Ms. Whiting also stated that they were
"goin' together". When asked by the prosecutor
how many of the ten days preceding defendant's
arrest defendant had stayed in the townhouse, Ms.

Whiting answered "ten days". Defendant kept items of clothing on the premises. While he did not pay rent or provide funds to pay for the utilities, he did contribute money for groceries. Ms. Whiting further indicated that, "If he had the money, he helped".

Given the foregoing, I think that the following excerpt from *Rakas* clearly reveals that the dissent's analysis of the defendant's Fourth Amendment rights in the searched premises is simply wrong:

"Here petitioners, who were passengers occupying a car which they neither owned nor leased, seek to analogize their position to that of the defendant in *Jones v United States*. In *Jones,* petitioner was present at the time of the search of an apartment which was owned by a friend. The friend had given Jones permission to use the apartment and a key to it, with which Jones had admitted himself on the day of the search. He had a suit and shirt at the apartment and had slept there 'maybe a night,' but his home was elsewhere. At the time of the search, Jones was the only occupant of the apartment because the lessee was away for a period of several days. * * * Under these circumstances, this Court stated that while one wrongfully on the premises could not move to suppress evidence obtained as a result of searching them, 'anyone legitimately on premises where a search occurs may challenge its legality.' * * * Petitioners argue that their occupancy of the automobile in question was comparable to that of Jones in the apartment and that they therefore have standing to contest the legality of the search—or as we have rephrased the inquiry, that they, like Jones, had their Fourth Amendment rights violated by the search.

"We do not question the conclusion in *Jones* that the defendant in that case suffered a violation of his personal Fourth Amendment rights if the search in question was unlawful.

"Nonetheless, we believe that the phrase 'legitimately

on premises' coined in *Jones* creates too broad a gauge for measurement of Fourth Amendment rights. For example, applied literally, this statement would permit a casual visitor who has never seen, or been permitted to visit, the basement of another's house to object to a search of the basement if the visitor happened to be in the kitchen of the house at the time of the search. Likewise, a casual visitor who walks into a house one minute before a search of the house commences and leaves one minute after the search ends would be able to contest the legality of the search. The first visitor would have absolutely no interest or legitimate expectation of privacy in the basement, the second would have none in the house, and it advances no purpose served by the Fourth Amendment to permit either of them to object to the lawfulness of the search.

"We think that *Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place. * * * In defining the scope of that interest, we adhere to the view expressed in *Jones* and echoed in later cases that arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control. * * * But the *Jones* statement that a person need only be 'legitimately on premises' in order to challenge the validity of the search of a dwelling place cannot be taken in its full sweep beyond the facts of that case." 439 US 140-143 (footnotes and citations omitted).

Since, even after *Rakas,* the Supreme Court continues to acknowledge that the petitioner in *Jones, supra,* an overnight guest, had sufficient interest in the premises to challenge the search, defendant here, a resident of the searched premises, but not a named lessee, also had a substantial Fourth Amendment interest, conferring upon him standing to challenge the search here.

The dissent finds significant the fact that Ms.

Whiting, defendant's girlfriend, had the legal right to remove the defendant from the premises. By this rationale, a youth who had obtained his majority but who continued to live with his parents in their house would have no legally protectable privacy right in his own home because his parents could legally force him to move. The youth may have lived with his parents for 19 years. Similarly, if one or more of a group of college students sharing a house had not actually signed the lease with the lessor, under the dissent each nonlessee would have no legally protectable expectation of privacy in his own living quarters. I further note that the petitioner in *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967), was a mere licensee who neither lived in nor leased the public phone booth to which the FBI agents had attached electronic listening devices.

In Michigan, I have uncovered only three cases comparable to this one, other than the first *Wagner* case, 104 Mich App 169; 304 NW2d 517 (1981), applying *Rakas.* The decisions of both cases lend support to my view of what constitutes a reasonable expectation of privacy. In *People v Mack,* 100 Mich App 45; 298 NW2d 657 (1980), *lv den* 411 Mich 1000 (1981), an expectation of privacy was found on the following facts:

"At the evidentiary hearing, testimony revealed that the house belonged to defendant's mother and was occupied by his cousin. Defendant was not present when the search took place, but he had been living there for approximately two weeks. Although defendant maintained another address where he received his mail, he had some of his clothing at his mother's home and was free to come and go as he pleased." *Id.,* 47.

The instant case is not even as close as *Mack.*

Here, defendant was on the premises at the time of the search and had been living there for a longer period of time than the defendant in *Mack.* As Judge BASHARA's dissent in *Mack* reveals, defendant there was not paying rent and claimed to be "just visiting". Nonetheless, the majority found that defendant had sufficient interest to challenge the search.

In *People v Nabers,* 103 Mich App 354; 303 NW2d 205 (1981), *rev'd in part on other grounds* 411 Mich 1046 (1981), we found that defendant had a reasonable expectation of privacy where it was clear that he had free run of the premises, had clothing on the premises, and answered the door when the police came. The evidence in *Nabers* failed to show defendant's specific relationship to the searched premises and at least some testimony indicated that he did not live there. All that was really established in *Nabers* was that the defendant was at least an overnight guest of the codefendant.

I find it interesting that the Supreme Court order partially reversing *Nabers* was based on the finding that there was probable cause to arrest defendant. This question would not have had to have been reached had the Supreme Court concluded on the record before it that defendant had no constitutionally protectable expectation of privacy in the premises.

In *People v Van Auker,* 111 Mich App 478; 314 NW2d 657 (1981), this Court held that the defendant had a "legitimate expectation of privacy" sufficient to confer standing where the record showed that he and his girlfriend had stayed at his girlfriend's cousin's apartment for a "couple of days" prior to the police intrusion. Certainly, if the facts of *Van Auker* show a legitimate expectation of privacy, the facts of this case also do.

I have examined every state case citing *Rakas* listed through the September, 1981, supplement to Shepard's United States Citations. While most of these cases were not analogous to the instant case, the overwhelming majority of those that are analogous support my position.

In *State v Allen,* 612 P2d 199 (Mont, 1980), the Montana Supreme Court found that defendant, who lived with his girlfriend, had a legitimate expectation of privacy in the premises even though he personally had no contractual relationship with the lessor. *Allen* differs from this case in that the defendant there did pay rent.[1] In *Commonwealth v Wagner,* 486 Pa 548; 406 A2d 1026 (1979), the Pennsylvania Supreme Court found that the defendant had a reasonable expectation of privacy in the invaded sphere based on the following facts. Defendant was arrested in the home of his fiancée, Vellora Short. Defendant spent a lot of time, including nights and weekends, at the house. Miss Short's sister said that defendant lived in the house. Defendant, himself, however, did not claim to live at the address at the time of his arrest, rather, he had given the police a post office box as his address. The opinion fails to mention whether defendant paid Short any rent. In *Commonwealth v Evans,* 488 Pa 38; 410 A2d 1213 (1979), the Court found that a mere overnight guest had sufficient interest in the premises to consent to the search.

---

[1] I do not deem the payment of rent as especially important. The *Rakas* case explicitly denies an intention to determine Fourth Amendment rights based primarily on proprietary rights. In my view, if the payment of rent be deemed significant in the ordinary case, the Fourth Amendment is improperly construed. Such a construction establishes inequality. The poor, who cannot afford to pay rents and are living gratuitously with others, would have Fourth Amendment rights many times deflated in relation to the middle class and wealthy. In my summary of the cases, I mention whether the opinions show if the defendant paid rent because Judge KELLY deems it important.

It held that defendant was more than a "casual visitor" who arrived on the scene just prior to the search. In *Brady v State,* 394 So 2d 1073 (Fla App, 1981), another overnight guest was found to have standing to challenge a search. Brady apparently was indigent. She was planning to stay for a few days in a male friend's motel apartment and had her belongings with her. The court specifically noted that she was not paying rent while staying on the premises. In *Commonwealth v Bertram,* 596 SW2d 379 (Ky App, 1980), a remand was ordered to determine the defendant's interest in the searched premises. In that case, a cabin on defendant's father's property was searched. Defendant lived with his father. The Court indicated that if the defendant had permission to use the cabin, he had a sufficient interest in the premises to contest the validity of the search. Again, the defendant's status as rent payer was unclear.

In addition to the above cases dealing with privately maintained premises, a series of cases dealing with commercial premises also support my position that defendant here had a reasonable expectation of privacy in the premises. In *State v Williams,* 168 NJ Super 359; 403 A2d 31 (1979), *aff'd* 84 NJ 217; 417 A2d 1046 (1980), the defendant was apprehended with lottery paraphernalia and revolvers in the basement storage room of a tavern. Defendant lived in an apartment above the bar and was the custodian of the entire building. Defendant kept his tools in the basement room and liquor was also stored there. The tavern was actually owned by a corporation of which the principal shareholder was defendant's sister. Despite the fact that defendant did not own the tavern and his use of the storage room was not exclusive, a reasonable expectation of privacy was

found to exist. In *State v Hodges,* 287 NW2d 413
(Minn, 1980), the court held that a sublessee's
failure to timely pay rent on commercial property
did not preclude a reasonable expectation of pri-
vacy in the premises. Nor was this expectation of
privacy defeated by a clause in the sublease autho-
rizing the sublessor to enter the premises for
inspection. In *People v Davis,* 86 Ill App 3d 557;
407 NE2d 1109 (1980), a decision from the state
which brought us *Rakas,* the court determined
that defendant had standing to contest a police
entry of his employer's premises. The court did not
deem it decisive that defendant might have ex-
pected coworkers to enter the building and found
that he had a reasonble expectation of privacy in
the premises searched. In all of these commercial
cases, the premises searched were more open to
others than is true of the townhouse here. Despite
the lack of exclusivity, however, the defendants
were still deemed to have sufficient interests to
challenge the searches.

I find only a few cases arguably supporting the
dissent's determination that defendant had no
reasonable expectation of privacy in the premises
searched. In two Nevada cases involving one inci-
dent and one defendant the court found that the
defendant's mere presence in the apartment did
not give him a legitimate expectation of privacy in
the same. In these cases, however, the defendant
apparently produced no evidence showing his con-
nection to the apartment. Moreover, it appears
that the court's handling of the *Rakas* issue is
mere dicta since the true owner consented to the
search. See *Hicks v State,* 95 Nev 503; 596 P2d 505
(1979), *Hicks v State,* 96 Nev 82; 605 P2d 219
(1980). In *State v Jones,* 299 NC 298; 261 SE2d 860
(1980), the court found that the defendant had

failed to meet his burden of proving that he had a reasonable expectation of privacy in his parent's garage. In *Jones,* the defendant lived elsewhere but used his parent's garage as an auto workshop, as well as for storage of his tools there. The standing question is only briefly discussed in *Jones* and the court actually upheld the search warrant in that case as valid. I disagree with the *Jones* resolution of the standing issue. Nonetheless, it is easy to distinguish the use of a garage from actually living in a townhouse, as in this case. One enjoys the strongest expectations of privacy in one's living quarters. Finally, in *Lee v State,* 419 NE2d 825 (Ind App, 1981), the court held that the defendant, who had been a guest in a house trailer for three days and was on the premises at the time of the search, had no reasonable expectation of privacy in the invaded sphere. The court found it significant that the defendant was one of four persons on the premises, had no key to the trailer, and kept no personal belongings there except the stolen items. For obvious reasons, *Lee* is not compelling authority. In any case, I also believe *Lee* is wrongly decided.

I also note the following series of decisions which, although factually different from the instant matter, suggest through what they emphasize that the courts which decided them would agree with my resolution of the standing issue in this case. *Inter alia: McGee v State,* 383 So 2d 881 (Ala Crim App, 1980), *People v Little,* 198 Colo 244; 598 P2d 140 (1979), *People v Sumlin,* 105 Misc 2d 134; 431 NYS2d 967 (1980), *People v Buckley,* 81 AD2d 511; 437 NYS2d 350 (1981), *State v Sweatt,* 427 A2d 940 (Me, 1981), *State v Tidwell,* 23 Wash App 506; 597 P2d 434 (1979), *State v Christian,* 26 Wash App 542; 613 P2d 1199 (1980),

*People v Thomas,* 89 Ill App 3d 592; 411 NE2d 1076 (1980), *Nolan v State,* 588 SW2d 777 (Tenn Crim App, 1979), *State v Bellah,* 603 SW2d 707 (Mo App, 1980), *Holt v State,* 396 NE2d 887 (Ind, 1979), *Waters v State,* 415 NE2d 711 (Ind, 1981).

I continue to believe that *Rakas, supra,* is an ill-reasoned opinion. Merely because a person does not live in, or even stay at, the searched premises does not mean he has no reasonable expectation of privacy in the premises vis-à-vis the police. In most cases, the contrary would be true. Whenever the people living on the premises are conspiring to commit an illegal activity or at least know of contraband being stored within their home, it is safe to say that the possessor of the contraband or incriminating evidence legitimately believes it will be safe from unlawful intrusions by the police. The possessor of the incriminating items in actuality does have a reasonable expectation of privacy in the premises in respect to everybody but its occupants or joint occupants, as the case may be. See *People v Chernowas,* 111 Mich App 1; 314 NW2d 505 (1981). See, also, for similar holdings, *State v Johnson,* 301 NW2d 625 (ND, 1981), *State v Morsman,* 394 So 2d 408 (Fla, 1981), *State v Daugherty,* 94 Wash 2d 263; 616 P2d 649 (1980), *Davis, supra.*

The rule of *Rakas* actually serves as an incentive, encouraging police illegalities in certain situations. The police, knowing that a given suspect will not be allowed to challenge the legality of a search, are faced with no real deterrent in situations where they suspect an individual of storing incriminating evidence in another's home. On this point, see *People v Ward,* 107 Mich App 38; 308 NW2d 664 (1981) (Judge M. F. CAVANAGH, *dissenting),* the facts of which suggest that this very thing may well have happened. Consequently, I believe

that the privacy and security of individuals against arbitrary invasions by governmental officials is involved in cases such as the one at bar.

## II

### *Was there a valid consent search of the townhouse?*

In my opinion, the dissenting opinion does precisely what *Rakas, supra,* 143, warns against, namely: importing "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like". Defendant, despite the fact that he lived in the searched premises, was a mere "guest" in the dissent's view because his name was not on the lease. Consequently, Mr. Hartranft, another "guest" had just as much right to consent to the search as the defendant. Assuming, *arguendo,* that in light of *Rakas, supra,* this "guest" analysis comports with current federal constitutional doctrine concerning Fourth Amendment law, I would still find it unacceptable as a means of resolving this case. I see a vast difference between a nonlessee "guest" living in the searched premises and an overnight guest. I believe that the average person would be extremely surprised and irked if an overnight guest invited various police officers or anybody else into his home without explicit authorization. However, I also believe that this same person would most likely not object if his children, who were staying at the house, invited somebody into the premises.

I agree with Judge KELLY's opinion that *People v Adams,* 53 NY2d 1; 439 NYS2d 877; 422 NE2d 537 (1981), expresses the proper approach to resolving consent search issues similar to those

posed here. It is my opinion that the police here abused their powers when they searched the premises on the "authority" of one whom they knew did not reside on the premises. This is particularly true given that the defendant was not asked for permission to search and the police knew that he was at least a part-time resident of the townhouse. Moreover, I think that the dissent's conclusion that Hartranft had the right to consent to the search flies in the face of existing Michigan precedent.[2] See *People v Overall,* 7 Mich App 153; 151 NW2d 225 (1967), *People v Flowers,* 23 Mich App 523; 179 NW2d 56 (1970), *lv den* 384 Mich 780 (1970), *People v Frank Smith,* 43 Mich App 400; 204 NW2d 308 (1972), *People v Mazzulla,* 71 Mich App 418; 248 NW2d 567 (1976) (opinion of Judge R. M. MAHER). See, also, *Stoner v California,* 376 US 483; 84 S Ct 889; 11 L Ed 2d 856 (1964).

### III

*Was the search justified because of exigent circumstances?*

I also disagree with the dissent's conclusion that exigent circumstances justified this search. I begin by noting that the prosecution has never argued "exigent circumstances" as a justification for the search. I suggest that this, in and of itself, could well be taken as saying something about how meritorious this claim is.

On the merits of the dissent's finding, the follow-

---

[2] I further note that to describe Hartranft as consenting to the search is not an entirely accurate assessment of the record. In fact, Lieutenant Timothy Ryan merely asked Hartranft whether he would be willing to retrieve the guns, and Hartranft answered in the affirmative. Thereafter, Ryan simply entered the premises with Hartranft and followed him to the weapons. Ryan admitted that he never asked Hartranft for permission to go with him.

ing is applicable. For a search to be justified based on the existence of exigent circumstances, there must be imminent danger of destruction or concealment of evidence. *Vale v Louisiana,* 399 US 30, 34-35; 90 S Ct 1969; 26 L Ed 2d 409, 413-414 (1970), *People v Carter,* 387 Mich 397, 410-411; 197 NW2d 57 (1972).

In this case, four officers were present at the scene, and both defendants were immobilized. There was no evidence that the officers believed that anybody involved with the crimes might escape, that incriminating items would be destroyed, or that the officers needed protection. It would have been very easy for the police to secure the premises and seek a search warrant before proceeding into the townhouse. It is difficult for me to imagine any search which could not be justified by "exigent circumstances" if the dissent's analysis of this self-created issue were correct.

Nor did the search become more reasonable because the police were looking for firearms. They were in no danger outside of the townhouse, with the defendant and Hartranft, the cofelons, safely controlled. The dissent's attempt to make the seized guns an immediate threat to the public is not persuasive for this reason. Additionally, assuming that it makes any sense to cite the anti-exclusionary provision of Mich Const 1963, art 1, § 11, in a search and seizure case turning on federal constitutional law, the dissenting opinion notes that it would not have applied to this case anyway. Reliance on a state constitutional provision which conflicts with the federal constitution, where the provision would be inapplicable in any case, strikes me as an odd sort of justification for a search.

IV

*Should defendant's confessions have been
suppressed as the fruit of an illegal search?*

On this particular issue, I have nothing to add
to Judge KELLY's excellent analysis.

V

*Does the erroneous decision to admit defendant's
confessions and the items seized at the townhouse
require reversal?*

In the first *Wagner* decision, this Court found
that the errors arising from the improper admis-
sion of evidence at trial were harmless. I agonized
over this question in the original *Wagner* case and,
in my opinion, it represents the outer boundaries
of error which can be deemed harmless. In the
first *Wagner* case, additional evidence supporting
the conviction was sufficient to render the error
harmless. Judge KELLY's opinion adequately sum-
marizes just what this other evidence was.

I further conclude that our refusal to reverse
this conviction and suppress the evidence in issue
would affirmatively undermine the right to be free
from unreasonable searches and seizures. Al-
though I do not believe in a "good faith" exception
to the exclusionary rule, since I believe that such
an exception will ultimately destroy the vitality
and protections afforded *all* the citizenry by the
rule, this search could not even be justified on the
"good faith" basis. The police knew that Hartranft
did not reside at the townhouse and also knew
that defendant did reside there at least part of the
time. When the police failed to ask the defendant
for permission to search, relying solely on Har-

tranft, they did not act in good faith. The dissenting opinion does not protect "the right to privacy" as it allows yet more people to "consent" to the waiver of the Fourth Amendment rights of others. The exclusionary rule may not be perfect, but I am convinced that only by retaining it and keeping it vital will all citizens, not just criminals, be secure from arbitrary governmental intrusions into their homes, persons and businesses. We hear a lot about the relatively few cases where the exclusionary rule results in a criminal conviction being overturned. I would rather that such cases exist than return to an era when there was no effective deterrent to illegal police searches. Without an effective deterrent, I am convinced that we would soon begin to hear about instances in which law-abiding citizens had their persons and homes invaded on the flimsiest of police suspicions.

I concur in reversing the defendant's convictions.

R. M. DANIELS, J. *(dissenting)*. In spite of the majority's opinions and the decision in *People v Wagner*, 104 Mich App 169; 304 NW2d 517 (1981), which dealt with the exact question at issue in this case, I must respectfully dissent. The majority has made a knowledgeable and careful analysis of the law of search and seizure, and I recognize that this is perhaps the current status of the law. I do, however, submit by way of the following analysis what I would hope the law is now and expect it to be in the future.

The seizure of the evidence from the attic of the home not owned by the defendant made under the consent of a party with apparent authority to give consent was not an illegal search and seizure under the Fourth Amendment of the United

States Constitution or Const 1963, art 1, § 11. "The basic purpose of this amendment, as recognized in countless decisions of (the United States Supreme Court), is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v Municipal Court,* 387 US 523, 528; 87 S Ct 1727; 18 L Ed 2d 930 (1967). This purpose is not undermined by admitting the evidence seized by the police officers in this case. By looking at the totality of the circumstances it is readily apparent that the defendant's Fourth Amendment rights were not abridged.

There are two major concerns of the Fourth Amendment, neither of which are threatened in the present case: 1) concern for the privacy of the individual and 2) concern for arbitrary invasions by government officials.

To justify a search without a warrant by proof of consent, the prosecution may show that permission to search was given by a third party who had a sufficient relationship to the effects inspected. *United States v Matlock,* 415 US 164; 94 S Ct 988; 39 L Ed 2d 242 (1974). In this case, Mr. Hartranft had spent the previous night in the house, had access to the attic and had used some of the seized property in the robbery in which he had participated. The same is true of the defendant. While it may be true that the defendant lived in the house, he had no legal interest in the house and could be forced to leave upon the request of Ms. Whiting at any time. He was, in effect, a guest in the home, as was Mr. Hartranft. Even if a constitutional right to privacy in the attic did exist—which I deny— both defendant and Hartranft possessed that right equally and, thus, either could consent to a search of the attic. Defendant, by sharing the hiding place in the attic with Mr. Hartranft, assumed the risk

that Mr. Hartranft would consent to a search. *United States v Matlock, supra.*

The exigent circumstances exception to the requirement of a warrant provides that if an officer has probable cause to believe that a search of a certain place will produce specific evidence of a crime there is no need for a warrant if a search without a warrant is necessary to protect the officers, prevent the loss or destruction of evidence, or prevent the escape of the accused. All three circumstances were present when the officers in this case made their search and seizure of the guns and other evidence.

If Mr. Hartranft had gone alone into the house to get the guns there would have been no Fourth Amendment issue, but since the officers accompanied him the issue was raised. Hartranft had admitted committing the robberies before the officers entered the house. The officers had a responsibility to keep him in custody. They could not let him go into the house alone without taking the risk he would escape out a window or the back door. Nor could they reasonably allow him to reach into the attic for guns which could be used against them. Nor would it have been feasible to take the men to the police station, get a warrant, and return for the guns. It would have been a simple matter for some other person to remove the guns in the interim. It must also be remembered that Mr. Hartranft volunteered to get the guns for the officers and, when he was refused permission, he volunteered to show the officers where the guns were. These are certainly sufficient exigent circumstances to validate the search without a warrant.

Another significant factor which should be noted in determining whether the guns should have been admitted as evidence is the threat the items posed

to the community. It is informative in this connection to consider the anti-exclusionary provision of Const 1963, art 1, § 11. Although it has been struck down as incompatible with the federal constitution, and although it would not have applied here where guns were seized from within the curtilage of a dwelling house, the policy behind this provision is that the violent potential of the evidence seized renders the police officers' actions more reasonable than if the items were not so dangerous.

In reviewing this case it is apparent that defendant was not denied his Fourth Amendment rights. He did not possess a sufficient interest in the area searched to give him a legitimate expectation of privacy. While he may have had a right to privacy in more personal areas, the attic was not so personal as to warrant the expectation of protection from a search. This factor, coupled with proof that the police entered under the authority of Hartranft, shows that the Fourth Amendment was not undermined. The two major concerns of that provision, i.e., the right to privacy and the prevention of abuse of power by government officials, were adequately protected. Furthermore, the threat that dangerous items, such as the guns in this case, pose to the community cannot be taken lightly, and they should not be excluded as evidence when they are secured by police officers in an orderly manner for the purpose of protecting the public. Accordingly, the evidence was properly admitted by the trial court.

Since there was no illegal search or seizure, the defendant's statements or confessions were not tainted, and the majority's discussion regarding inadmissibility of these statements or confessions is inapplicable.

I agree with the majority's analysis affirming the trial court's denial of defendant's motion to withdraw his waiver of right to a jury trial.

I would affirm.