UNITED STATES of America,
Plaintiff-Appellant,

v.

Bill RUCINSKI, and Alfred Medina,
Defendants-Appellees.

No. 80–2247.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted July 15, 1981.

Decided Aug. 31, 1981.

Rehearing Denied Sept. 24, 1981.

Marianne Wesson, Asst. U. S. Atty., Denver, Colo. (Joseph Dolan, U. S. Atty., Denver, Colo., with her on the brief), Asst. U. S. Atty., D. Colo., Denver, Colo., for plaintiff-appellant.

Jonathan L. Olom of Marks & Olom, Denver, Colo., for defendant-appellee, Alfred Medina.

Sander Karp of Karp, Goldstein & Stern, Denver, Colo., for defendant-appellee, Bill Rucinski.

Before McWILLIAMS and DOYLE, Circuit Judges, and TEMPLAR *, District Judge.

PER CURIAM.

In a two-count indictment, the defendants Bill Rucinski and Alfred Medina were charged with the theft of government property in violation of Title 18, United States Code, Section 641; [1] defendant Medina was charged in both counts, defendant Rucinski in the second count alone. Defendant Rucinski filed a pretrial motion, adopted by defendant Medina, for the suppression of certain real evidence and testimony of a statement given by Rucinski. After holding an evidentiary hearing, the court below granted the defendants' motion. In addition, the court below severed the trials of the two defendants. The court's stated reason for the severance was the existence of an incriminating statement of defendant Rucinski, but the court also ruled that the Rucinski statement would be suppressed as a "fruit" of illegal surveillance. By Notice of Appeal, the United States signified its intention to seek appellate review of the orders of the court below. 28 U.S.C. § 1291.

The facts, as claimed by defendant Rucinski, are these:

In March of 1979, an investigation was started by the United States Forest Service concerning some possible irregularities in the scaling of cut timber by the Jackson Lumber Company. Officials of the United States Forest Service had received reports

---

* Honorable George Templar of the United States District Court for the District of Kansas, sitting by designation.

1. Section 641 provides:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

The word "value" means face, par, or market value or cost price, either wholesale or retail, whichever is greater.

that Jackson Lumber Company was manipulating the reports of timber cutting at the Treasure Pass Timber Sale. "Scaling" is a term of art in the timber business which describes the volume that a cut log may produce in board feet. Live logs are worth considerably more than dead logs, and the essential allegations of this case involved the manipulation of live logs and dead logs so as to deprive the government of the value of live logs which had been cut by Jackson Lumber Company on the Treasure Pass Timber Sale.

Paddy Ryan, a United States Forest Service official, first became aware of these reported irregularities in March of 1979. In September of 1979, when Jackson Lumber Company resumed work on the Treasure Pass Timber Sale, the investigation started up again. This investigation led to the events of September 12, 1979, which are at issue in this case.

After the Forest Service received this information, they decided to conduct a telescopic and photographic surveillance of the Jackson Lumber Company.

The Jackson Lumber Company is a privately owned lumber company [2] located in an isolated valley in South Fork, Colorado. The lumber company mills timber which is largely obtained from the United States Forest Service. Public access to the Jackson Lumber Company is only allowed on business, and there is only one road into and out of the lumber company, this being the access road which runs off of State Highway 160.

Half way up the road which leads to the main business office and the residence of defendant Rucinski is a gate and a sign which says, "No Admission Except on Business." Rucinski's residence is adjacent to the main lumber company office. The area is posted with no trespassing signs, and the entire lumber company is surrounded by a barbed wire fence. The general public does not have access to the lumber company without the consent and permission of the

owner. Any person desiring access must stop at the office and receive permission to enter the mill and business area.

The south side of the Jackson Lumber Company is bounded by the BAR Cattle Company. This is private land, which is part of a ranch managed by Mr. Clinton Landon. On September 5, 1979, Charlie Burd of the Forest Service approached Mr. Landon and asked for his permission to go onto the BAR land. Landon and Burd had been acquainted for several years.

Burd's reason for requesting permission to go on the BAR land was so that he could set up the surveillance of the operations of the Jackson Lumber Company, but he did not tell Mr. Landon what his purpose would be.

In addition to the foregoing, the record discloses that the evidence against the defendants, and suppressed by the trial court, consists of the observations of agents of the United States Forest Service, who observed the defendants in the act of manipulating the contents of loads of lumber purchased from the Forest Service in order to avoid paying for higher-priced live lumber by substituting cheaper dead logs. The activities took place in an open outdoor millyard, enclosed only by a barbed wire fence. The millyard is situated in a valley and consequently may be observed from several local vantage points. Their observations were aided by a "spotting scope" (a telescope-like instrument) and a camera with a telescopic lens. The agents used the camera to photograph the activities that they observed.

It also appears, and the defendant admitted, that in order to purchase government timber, the Jackson Lumber Company was required, by contract, to permit the Forest Service "scaling" personnel to arrive unannounced at random intervals and inspect the logging business. This inspection was for the purpose of detecting irregularities or fraud in the defendants' logging operation.

---

**2.** Defendant Rucinski and his wife are owners of Jackson Lumber Company. Defendant Medina is an employee.

The district court in its spoken opinion explained its ruling with the statement that the testimony had made clear what a "reasonable expectation of privacy is in the mountains of Colorado" and that the law enforcement activity, although perhaps legitimate in other environs, violated that expectation because "living in that community is based on a heightened sense of privacy and a heightened sense of respect for the concept of private property."

Having obtained access to the land of the BAR Cattle Company on September 12, 1979, Burd and Ryan went upon the land to set up the surveillance. They positioned themselves some distance from the Jackson Lumber Company, a distance which was variously estimated as 800 to 1,000 feet. They took with them a telescope of 50–60 power, and a Pentax Camera with a 500 mm lens and a 2x tele-converter, which, when interposed between the lense and the camera body, creates a magnification of 1,000 mm. This leads to magnification of 20 power, that is to say, objects are magnified 20 times larger than the human eye would normally see.

Ryan took up surveillance with the telescope, while Burd manned the camera. The agents concealed themselves so that they could not be seen by personnel at the Jackson Lumber Company. They did not have permission from anybody at the Jackson Lumber Company to conduct this surveillance.

The telescope was used to see if logs coming into the lumber mill were live or dead, and to read the numbers on the sides of the logs. Ryan needed the spying scope to see the numbers written on the sides of the logs which identified where the logs came from. The camera was used for the same purpose, and Burd used the camera and its magnification equipment as a telescope to tell live logs from dead logs and to observe the numbers painted on the sides of the logs. The camera was also used to take numerous pictures of logging operations which pictures were also suppressed.

We now reach the pivotal issue in the case. Was there a violation of defendants'

Fourth Amendment rights which would require not only the suppression of the photographs taken by the agents but also the suppression of evidence of what their observations disclosed without the aid of the telescopic and photographic equipment?

### Agents' Presence on BAR Cattle Company Land

Defendants argue that somehow the agents conducting the surveillance were guilty of reprehensible deceit in obtaining permission to go upon the BAR Cattle Company property and that they, in fact, became and were trespassers at the time the observations and the photographs were made. There is no claim that the agents were at any time on Jackson Lumber Company property. Nor does the court consider the agents to be trespassers on BAR Cattle Company land. It would be a strange requirement indeed if agents of the Forest Service must broadcast to the countryside the purpose of a surveillance undertaken to protect a federal interest. They had permission, not by any misrepresentation, although Mr. Landon testified he would not have granted permission had he known the total objective of their photography. This does not nullify the permission he did give. The BAR Cattle Company is not seeking to suppress the evidence and his statement that he would not have granted permission to make the inspections had he known the purpose is purely a neighborly afterthought.

### Furtherance of Federal Interest

The defendants place emphasis on the fact that this lumber operation was located a distance from the highway, in a valley where it could not be observed except by means of a private roadway. Admission to the premises could be obtained only from the office along the private road and then only by a person having business there.

Defendant argues that a warrantless surveillance of his property was not permissible because the timber contract he had with the government did not specifically authorize an inspection of the type which occurred in this case.

It should be realized that, contrary to defendants' right to the expectation that they would be free from government representatives inspecting their operation, Jackson Lumber Company was under a contractual obligation, as a provision of its timber purchase contract with the United States, to permit Forest Service "scaling" personnel to arrive, unannounced and at random intervals, and to make inspections for the purpose of detecting irregularity or fraud in the operations of timber contractors. So an unannounced inspection by the agents was something to be anticipated at any time. It was not a condition that the inspections might be made directly on the premises of the Jackson Company. Effective inspection might be made in the manner employed by the government representatives. The type of inspection chosen was apparently what the agents considered to be the most effective.

Defendant urges that the dwelling of defendant was located in the vicinity of the premises photographed and observed, but we find no claim that photographs were taken or that telescopic observations were made of the defendant's dwelling. The photos and observations were made of an area on which the logging operations were conducted, consisting of an open area surrounded by a barbed wire fence which did not interfere with the view of one taking photos or making observations of what could be plainly seen. Nor were the logs observed within the curtilage of defendant's residence because the logs were not for their use and enjoyment and were not an adjunct to the domestic economy of the family. *Fullbright v. United States*, 392 F.2d 432 (10th Cir. 1968).

It cannot be disputed that there is a substantial federal interest in preventing the theft of government property from a national forest. It is important that this interest be protected to prevent the substitution of live logs for dead logs. The need for an unannounced inspection to detect irregularity or fraud in operations of timber contractors is apparent. An unannounced inspection was consented to by defendant so he cannot effectively complain that the inspection was one he did not contemplate. *Cf. Zap v. United States*, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477.

The defendant submits that the recent case of *Donovan v. Dewey*, —— U.S. ——, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), specifically determined that an inspection of commercial property without a search warrant is prohibited under the Fourth Amendment unless there is a regulatory scheme of legislative authority providing for a warrantless search.

We believe that defendant undertakes to construe the application of *Donovan* more narrowly than its language justifies. The decision does analyze the current limitations which the court has placed on the inspection of commercial property.

We do, however, note that the Supreme Court took occasion to add that the inspections of commercial property *may* be unreasonable if not authorized by law *or are unnecessary for the furtherance of federal interests*, 101 S.Ct., at 2538. (Emphasis supplied.) Here, we believe the inspection made of the logs harvested from a national forest to determine whether theft of live logs was occurring was indeed a federal interest to be protected. No property was seized; none was even molested. The objects observed were in plain view and under circumstances in which the defendant cannot contend that he could not anticipate the observations which were made. The defendant could not help being aware that the logs he had harvested under his contract with a government agency would be subject to unannounced inspections undertaken for the specific purpose of determining whether any manipulation of sample loads of logs was taking place. *Donovan v. Dewey, supra*. Nor was this inspection so random, infrequent, or unpredictable that defendant, for all practical purposes, had no real expectation that the logging operation would not be subjected to unannounced inspections from time to time by Forest Service officials. *See Marshall v. Barlow's Inc.*, 436 U.S. 307, 323, 98 S.Ct. 1816, 1825, 56 L.Ed.2d 305 (1978).

■ *Donovan* holds that while searches of private homes generally must be conducted pursuant to a warrant in order to be reasonable, the interest of the owner of commercial property is not one in being free from any inspections. The Fourth Amendment protects the interest of the owner of property in being free from unreasonable intrusions onto his property by government agents. There was no unreasonable intrusion here.

■ We have reviewed the several decisions in which surveillances of residences, apartments, business premises, offices and rooms, without a search warrant, have been consistently condemned. But, as stated in *Rakas v. Illinois*, 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387, "Capacity to claim protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the amendment has a legitimate expectation of privacy in the invaded place." We are persuaded from the facts before us that the millyard of Jackson Lumber Company, surrounded by nothing more opaque than a barbed wire fence, could scarcely be compared with those situations in which dwellings and structures occupied by persons having the expectation of privacy are protected from surveillance. Here, defendants could have no such expectation. The inspection was an event which could occur at any time chosen by the Forest Service agents without notice.

■ The fact that the agents used binoculars and a telescopic lens camera to magnify what they observed from adjoining properties does not change the application of the rules permitting search where the observation is lawfully made. *See* cases collected in annotation at 48 A.L.R.3rd, 1178, and 68 Am.Jur.2d, *Searches and Seizures*, § 25, at 681.

The burden of establishing that the search involved a protected area was on the defendant. We hold that he has failed to establish that fact. *Fullbright v. United States, supra.*

■ We believe that the order of the trial court suppressing all the evidence of-fered by the government in the prosecution of this case, including the photographs taken, the things observed by the use of a telescope and by the naked eyes of the agents, and the statements made by this defendant when he was shown the government's evidence, was clearly erroneous under all the facts. We do not believe that those living in the mountains of Colorado have a greater right to expectations of privacy than do citizens in other parts of the country.

The order of the trial court suppressing the evidence is vacated and the cause is remanded.