State of Connecticut *v.* Georgios Zindros
(10505)

Speziale, C. J., Peters, Healey, Shea and Spada, Js.

Argued October 7, 1982—decision released February 15, 1983

*Paul E. Murray,* assistant state's attorney, with whom, on the brief, was *Francis M. McDonald,* state's attorney, for the appellant (state).

*Edward G. Fitzpatrick,* with whom was *Raymond J. Shepack,* for the appellee (defendant).

ARTHUR H. HEALEY, J.  On February 12, 1977, a fire broke out in a building located on Highland Avenue in Waterbury.  The building was owned by Louis Cipriano and was under a lease to the defendant for his exclusive use as a pizza restaurant.  The premises suffered extensive damages rendering them unfit for occupancy.  In an information filed

in April, 1977, the defendant was accused of starting this fire and was charged with arson in the second degree in violation of General Statutes § 53a-112.[1]

On June 21, 1977, the defendant filed a motion to suppress all evidence, and related testimony, obtained in a search of the premises by police and fire officers on February 23, 1977. As the basis for his motion, the defendant claimed that the search was conducted without a warrant and without his consent. After an evidentiary hearing on the matter, the court, *Maiocco, J.,* granted the defendant's motion. Thereafter, the defendant filed a motion to dismiss the information against him with prejudice which was granted by the court, *Henebry, J.,* on November 12, 1980. On the same day, the state filed a request, pursuant to General Statutes § 54-96, for permission to appeal the judgment, which was granted by the court.

To assess the parties' claims properly, it is necessary to delineate certain events that led to the search of the leased premises on February 23, 1977, and to examine the business relationship between the defendant and his landlord, Cipriano, as that relationship was affected by the events occurring between the time of the fire and the search. The defendant was assigned the lease for the premises on April 15, 1976, with a term that ran until October 31, 1978. The defendant was current in

---

[1] General Statutes § 53a-112 provides, in part, as follows: "(a) A person is guilty of arson in the second degree when he starts a fire or causes an explosion: (1) With intent to destroy or damage a building, as defined in section 53a-100, (A) of another, or (B) whether his own or another's, to collect insurance for such loss; and (2) such act subjects another person to a substantial risk of bodily injury or another building to a substantial risk of destruction or damage."

his rent through the month of February, 1977. Furthermore, the court found that the lease had not been terminated at the time the officers conducted the warrantless search.

There are four clauses in the lease that are relevant to this appeal. The third clause provides, in part, that "if the leased premises shall be deserted or vacated, the Landlord or its agents shall have the right to and may enter the said premises as the agent of the Tenant." The tenth clause gives the landlord the right to enter the premises at reasonable hours to inspect and to make any necessary repairs on the premises. The eleventh clause deals with the parties' rights in the event the premises were destroyed by fire, explosion or otherwise. It provides as follows: "In the event of the destruction of the demised premises or the building containing the said premises by fire, explosion, the elements or otherwise during the term hereby created, or previous thereto, or such partial destruction thereof as to render the premises wholly untenantable or unfit for occupancy, or should the demised premises be so badly injured that the same cannot be repaired within ninety days from the happening of such injury, then and in such case the term hereby created shall, at the option of the Landlord, cease and become null and void from the date of such damage or destruction and the Tenant shall immediately surrender said premises and all the Tenant's interest therein to the Landlord, and shall pay rent only to the time of such surrender, in which event the Landlord may re-enter and re-possess the premises thus discharged from this lease and may remove all parties therefrom. Should the demised premises be rendered untenantable and unfit for occupancy, but yet be repairable

within ninety days from the happening of said injury, the Landlord may enter and repair the same with reasonable speed, and the rent shall not accrue after said injury or while repairs are being made, but shall recommence immediately after said repairs shall be completed. But if the premises shall be so slightly injured as not to be rendered untenantable and unfit for occupancy, then the Landlord agrees to repair the same with reasonable promptness and in that case the rent accrued and accruing shall not cease or determine. The Tenant shall immediately notify the Landlord in case of fire or other damage to the premises." Finally, the twenty-fourth clause provides that "[t]he foregoing rights and remedies are not intended to be exclusive but as additional to all the rights and remedies the Landlord would otherwise have by law." The significance of these clauses will be addressed while examining the substantive issues raised by this appeal.

As previously noted, the fire occurred on February 12, 1977. The defendant testified at the hearing on the motion to suppress that he first found out about the fire on Sunday, February 13, 1977, from both the landlord and his own daughter. He did not go into the restaurant on that day, but he did call the fire marshal to make an appointment for the marshal to inspect the premises the following day. Meanwhile, on Sunday, Cipriano had someone secure the building by boarding it up.[2]

[2] The defendant and Cipriano gave contradictory testimony at the suppression hearing as to why Cipriano secured the premises. Cipriano testified that he called the defendant on Sunday and requested that he board up the premises. The defendant allegedly responded by saying that he was "out of business." The defendant testified that he was told about the fire by his daughter on Sunday about the same time that Cipriano called him and she stated that the place was already boarded up.

He also testified that he had a new door put on the side of the building.[3] In response to a question asking him why he hadn't replaced the door, the defendant stated: "I didn't know that he had put the door and I didn't know whether he wanted to throw me out."

On Monday, February 14, two members of the Waterbury fire marshal's office inspected the premises. There was conflicting testimony as to who let them in;[4] however, it was the defendant who showed them around. Nothing was removed on that day, but the marshals were able to determine the place of origin of the fire.[5] The defendant resecured the premises when they left. The defendant at one point testified that he did not tell them they could not reenter the building because "I can't stop anyone."

The defendant visited the premises on at least two other occasions. Between February 16 and February 18, he met a representative of his insurance company, and on February 22, he met an inspector from the Waterbury health department. The defendant was concerned with the restaurant goods and equipment[6] that remained in the premises. After each visit, the defendant resecured the premises.

[3] There was conflicting testimony as to when this door was put on. Cipriano testified that he had asked one Bushka on February 13 to build it. The defendant testified that it was not built until after February 22. The defendant did testify, however, that it was Cipriano who put on the door.

[4] One of the fire marshals testified that Cipriano let them in by prying open the plywood on the front door with a hammer. The defendant testified that he was the person who let them in.

[5] Zindros testified that on February 14, 1977, the fire marshal told him where the fire had started inside the premises and that "[h]e [the fire marshal] said that it happened with gasoline."

[6] One of the state troopers who engaged in the search on February 23 testified that he saw booths, an oven and a refrigerator.

The defendant and Cipriano were in the building together on two or three occasions. One of the occasions was when the defendant was with his insurance representative. The defendant asked Cipriano to leave because he was making too much noise. Cipriano thereupon left. On no other occasion did either the defendant or Cipriano ask the other to leave.[7]

No formal action was taken on the part of the defendant or Cipriano to terminate the lease in accordance with its terms in the event of a fire. While the defendant testified that he did not really understand the lease, he felt that the lease was broken by the fire but that he was entitled to stay in the premises until the end of February because his rent was paid. Cipriano, on the other hand, requested that the defendant pay the rent for March.[8] Both Cipriano and the defendant cleaned out the premises. The defendant testified that although he felt that the lease was broken, it was also his responsibility to "repair" the place. He did not, however, take any action to make any substantial repairs because he was waiting for his insurance claim to be settled.

The search which was the basis for the defendant's motion to suppress occurred on February 23, 1977, eleven days after the fire. Officers of the Waterbury police department, the Waterbury fire

[7] Cipriano testified that on several occasions the defendant's attorney called him up and requested to be let into the building. It is unclear, however, whether these requests came before the search on February 23, or after the defendant had been arrested.

[8] Cipriano further testified that the defendant had told him he was going out of business. The defendant denied this and said several times that it had always been his intention to reopen the restaurant.

department, and the state police department were granted access to the premises by Cipriano. Neither a search warrant for the premises nor the permission of the defendant was sought by the officers. The police knew the defendant operated the restaurant and considered him to be a suspect. The sole purpose of the entry was to search for and obtain evidence of the arson. Upon gaining entry, the officers checked the air for hydrocarbons and removed a small piece of charred carpeting for testing. The rug was installed by Cipriano. In his motion, the defendant sought to suppress the test results on both pieces of evidence, as well as all evidence based upon the search of the premises and seizure of the evidence.

As a result of the fire Cipriano collected $21,000 from his insurance company for damage to the building. At the hearing in January, 1979, the defendant said that he had not collected any money on his insurance claim.[9] Subsequent to the fire, the defendant never reoccupied the premises or reopened the premises. After remaining vacant for seven months, the building was sold by Cipriano.

In making its claim that the trial court erred in granting the motion to suppress, the state essentially argues (1) that the defendant had no reasonable expectation of privacy in the premises searched that was fatally offended by the search, and (2) that the landlord Cipriano clearly had the authority to consent to the entry and the search by the officers whether such authority be denominated

---

[9] He testified that he "didn't get anything" and that "they [his insurance carrier] just returned the money that I paid for the insurance because the year wasn't up. They gave me the balance."

actual authority or apparent authority, thus requiring the conclusion that the search was "reasonable" under the fourth amendment.[10]

The issue of whether a "search" comes within the protection of the fourth amendment involves a twofold requirement under *Katz* v. *United States,* 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). The first is whether the person who is the focus of the inquiry has "exhibited an actual (subjective) expectation of privacy and, second . . . [whether] the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz* v. *United States,* supra, 361. Where it is established that law enforcement officials have encroached upon a defendant's reasonable expectation of privacy, and the trial court explicitly found that this had in fact taken place, then the focus of inquiry should move to the "reasonableness" of the search. That is, where there was a warrant, was it accomplished pursuant to the warrant and where there is no warrant, was it justified and thus constitutional because it was within an exception to the warrant requirement? The state does not disagree that the United States Supreme Court has made it clear that "a search conducted without a warrant issued upon probable cause is *'per se*

---

[10] There is no serious question raised of the defendant's standing on the motion to suppress in the sense that the state's brief recognizes that (as the trial court found) if the defendant's reasonable expectation of privacy is sustained, then the issue of the "reasonableness" of the search must be addressed. The United States Supreme Court in reference to "standing" has said: "But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *Rakas* v. *Illinois,* 439 U.S. 128, 139, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979).

unreasonable . . . subject only to a few specifically established and well-delineated exceptions.' " *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), quoting *Katz* v. *United States,* supra, 357; *Coolidge* v. *New Hampshire,* 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L. Ed. 2d 564, reh. denied, 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120 (1971); see also *Stoner* v. *California,* 376 U.S. 483, 486, 84 S. Ct. 889, 11 L. Ed. 2d 856, reh. denied, 377 U.S. 940, 84 S. Ct. 1330, 12 L. Ed. 2d 303 (1964); *State* v. *Tully,* 166 Conn. 126, 133, 348 A.2d 603 (1974); *People* v. *Adams,* 53 N.Y.2d 1, 7, 422 N.E.2d 537 (1981).

Two recognized exceptions to the warrant requirement are where searches have been undertaken pursuant to (1) "exigent circumstances";[11] see, e.g., *Mincey* v. *Arizona,* 437 U.S. 385, 392–94, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Terry* v. *Ohio,* 392 U.S. 1, 25–26, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State* v. *Runkles,* 174 Conn. 405, 412, 389 A.2d 730, cert. denied, 439 U.S. 859, 99 S. Ct. 177, 58 L. Ed. 2d 168 (1978); and (2) consent. See, e.g., *Davis* v. *United States,* 328 U.S. 582, 593–94, 66 S. Ct. 1256, 90 L. Ed. 1453, reh. denied, 329 U.S. 824, 67 S. Ct. 107, 91 L. Ed. 700 (1946); *Dotson* v. *Warden,* 175 Conn. 614, 618, 402 A.2d 790 (1978). The exceptions "have been jealously and carefully drawn." *Jones* v. *United States,* 357 U.S. 493, 499, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958); see *State* v. *Krause,* 163 Conn. 76, 80, 301 A.2d 234 (1972). The burden of proof is upon the state to show that an exception exists. *Coolidge* v. *New Hampshire,* supra, 455; see *McDonald* v. *United States,* 335 U.S. 451, 456, 69 S. Ct. 191, 98 L. Ed. 153 (1948);

---

[11] In oral argument before us, the state expressly disclaimed that it was relying upon the "exigent circumstances" exception.

*Dotson* v. *Warden,* supra, 618; *People* v. *Reed,* 393 Mich. 342, 362, 224 N.W.2d 867, cert. denied, 422 U.S. 1044, 95 S. Ct. 2660, 45 L. Ed. 2d 696 (1975). The Connecticut and United States constitutions "equally and conjointly prohibit unreasonable warrantless searches of private property. U.S. Const. amends. IV and XIV, § 1, Conn. Const. art. I, § 7." *Dotson* v. *Warden,* supra.

Before we analyze the issues raised by this appeal, it should be recognized that our power to upset the findings of the trial court is limited. We have stated our function here on many occasions. "On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See Practice Book, 1978, § 3060D. This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

The appropriate starting point for fourth amendment analysis here is, thus, the defendant's reasonable expectation of privacy. *Katz* recognized the importance of the individual's expectations of privacy when it explained: "For the Fourth Amendment protects people, not places. What a person

knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations omitted.] But what he seeks to preserve as private even in an area accessible to the public, may be constitutionally protected." *Katz* v. *United States,* supra, 351–52. The requisites for judicial recognition of a reasonable expectation of privacy that are to be given fourth amendment protection are (1) that the person involved exhibit an actual (subjective) expectation of privacy, and (2) that the expectation was one to be recognized (by society) as "reasonable." *Katz* v. *United States,* supra, 361. A reasonable expectation of privacy is one that is "legitimate." See *Rakas* v. *Illinois,* 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979) ; see also *United States* v. *Salvucci,* 448 U.S. 83, 91–92, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980). *Rakas* also held that an illegal search only violates the rights of those who have "a legitimate expectation of privacy *in the invaded place."* (Emphasis added.) *Rakas* v. *Illinois,* supra, 143. A person, of course, can have a legally sufficient interest in a place other than his own home so that the fourth amendment protects him from unreasonable governmental intrusion into that place. *Jones* v. *United States,* 362 U.S. 257, 263, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960) ; see *Rakas* v. *Illinois,* supra, 142–43. This also applies to commercial premises. See *Marshall* v. *Barlow's, Inc.,* 436 U.S. 307, 311–13, 98 S. Ct. 1816, 56 L. Ed. 2d 305 (1978) ; *Camara* v. *Municipal Court,* 387 U.S. 523, 534, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967).

The determination of whether a person has exhibited a subjective expectation of privacy requires

a detached evaluation of the facts and circumstances of the particular case. See *United States* v. *Brock,* 667 F.2d 1311, 1320 n.8 (9th Cir. 1982); *United States* v. *Sledge,* 650 F.2d 1075, 1077 (9th Cir. 1981). As we have indicated, the trial court was presented with conflicting evidence at the hearing on the motion to suppress. It is the function of the trier to determine the credibility of witnesses and the weight to be given their testimony. *State* v. *Rucker,* 177 Conn. 370, 378, 418 A.2d 55 (1979); *State* v. *Chisolm,* 162 Conn. 631, 632, 295 A.2d 563 (1972). There was ample evidence to support the trial court's determination that the defendant had a reasonable expectation of privacy "in the burned out and boarded up building" as of February 23, 1977. The court properly found, on this issue as well as on that of consent, that the defendant had not abandoned[12] the leased premises. "Abandonment is a question of fact. . . . It implies a voluntary and intentional renunciation, but the intent may be inferred as a fact from the surrounding circumstances. . . ." *Pizzuto* v. *Newington,* 174 Conn. 282, 285, 386 A.2d 238 (1978). On those occasions, between February 14 and February 23, when the defendant left the premises he secured them. He not only said that it was his intention to stay, but he always secured the site upon leaving because "I had my merchandise in there." The defendant said that he had damaged personal property inside this building which he claimed was worth approximately $6750. He said he was keeping the premises because he intended to reopen the business and he wanted to "fix it so I could work." No formal action was taken by either the defendant or the landlord to terminate the lease according to its terms in the

---

[12] See article third of the lease set out above.

event of a fire. The landlord did not ask him to leave and turn the premises over to him. His rent was paid through the end of February and so he felt he had the right to remain there until at least that time "because of my rent paid." He answered "yes" to the question: "Was it your intention to keep people out of the premises unless they were there with your premission?"[13] There was thus evidence before the court that, if believed, actually demonstrated the defendant's subjective expectation of privacy.[14]

Inasmuch as the trial court found that the defendant had a reasonable expectation of privacy, it follows that it also found that such an expectation in this case was one that "society is prepared to recognize as 'reasonable'" under *Katz* and its progeny.[15]

---

[13] The court also specifically found that the bare statement attributed to the defendant after the fire that he was "'out of business' certainly cannot be stretched to indicate an intent on his part to abandon the premises with all his valuable equipment still in it."

[14] Judge Spada's dissent recites a number of factual circumstances advanced purportedly to attack the conclusion that the defendant had a cognizable subjective expectation of privacy. These emphasize certain conduct of the landlord. Such analysis is inappropriate here because a determination of a defendant's subjective expectation of privacy focuses the examination on the defendant's acts and beliefs—not those of the landlord, Cipriano. See *Stoner* v. *California*, 376 U.S. 483, 489, 84 S. Ct. 889, 11 L. Ed. 2d 856, reh. denied, 377 U.S. 940, 84 S. Ct. 1330, 12 L. Ed. 2d 303 (1964).

[15] Judge Spada's dissent concludes that the expectation of privacy we conclude the defendant had is not one which society would recognize as reasonable, citing *United States* v. *Bellina*, 665 F.2d 1335, 1340 (4th Cir. 1981). He also cites *United States* v. *Rucinski*, 658 F.2d 741, 746 (10th Cir. 1981), cert. denied, 455 U.S. 939, 102 S. Ct. 1430, 71 L. Ed. 2d 649 (1982), for the proposition that private houses and commercial property are distinguishable in terms of the protection afforded by the fourth amendment.

We point out that *Bellina* involved the search of an *airplane* and the court noted the significance of that factor in stating that the "rule of a limited or diminished expectation of privacy that exists in connection with automobiles has been consistently held to attach

We agree that the court could legitimately conclude that this expectation was reasonable under the circumstances of this case. The court's determination that the defendant had the requisite expectation of privacy is not clearly erroneous and must stand. See *State* v. *Ostroski,* 186 Conn. 287, 294, 440 A.2d 984 (1982); *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 221–22; Practice Book § 3060D.

We turn now to the state's claim that the court erred in finding that the defendant's landlord,

to airplanes." *United States* v. *Bellina,* supra, 1341. In *Bellina* the court was not at all concerned with the reasonableness of one's privacy rights in commercial premises.

We do not quarrel with the proposition that, in certain circumstances the United States Supreme Court has held that administrative inspections of commercial premises do not require the full protection of a search warrant. *Rucinski* involved a search of the defendant's lumber mill premises from a distance by federal agents using cameras and a telescope to ascertain whether the defendant was manipulating the quality of logs he cut from government property under a contract in which he had already agreed to unannounced inspections. In holding that the defendant had no reasonable expectation of privacy in the mill yard of his lumber company which was surrounded by nothing more than a barbed wire fence, the court said that barbed wire fence " could scarcely be compared with those situations in which dwellings and structures occupied by persons having the expectation of privacy are protected from surveillance." *United States* v. *Rucinski,* supra, 746.

In *Rucinski,* the court relied upon the case of *Donovan* v. *Dewey,* 452 U.S. 594, 101 S. Ct. 2534, 69 L. Ed. 2d 262 (1981). In summarizing the law in this area the *Donovan* court said: "These decisions make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan* v. *Dewey,* supra, 600. The search of Zindros' commercial premises was hardly an inspection made pursuant to a regulatory scheme as it was in *Donovan* (federal inspection of a quarry concerning correction of 25 violations under the Federal Mine Safety and Health Act of 1977), but a search for evidence of a crime. Zindros' expectation of privacy, therefore, was such that society would recognize it as reasonable.

Cipriano, did not have the right to consent to the warrantless search of the leased premises. "In *Schneckloth* v. *Bustamonte,* 412 U.S. 218 [93 S. Ct. 2041, 36 L. Ed. 2d 854] (1973), the Court reaffirmed the principle that the search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment." *United States* v. *Matlock,* 415 U.S. 164, 165–66, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). The general rule of law is that a landlord may not consent to a search of the tenant's premises and this is true even where the landlord has some right to enter for purposes of inspecting and cleaning. *Chapman* v. *United States,* 365 U.S. 610, 616–17, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961). Professor LaFave, in stating that the general rule is that a lessor cannot give consent to a warrantless search of the premises occupied by his tenant, says: "The rule is not otherwise merely because the lessor has by express agreement or by implication reserved the right to enter for some special and limited purpose." 2 LaFave, Search and Seizure § 8.5(a), p. 739.[16] The state has the burden of proof on the issue of consent and that burden is not discharged by showing no more than acquiescence to a claim of lawful authority. *Bumper* v. *North Carolina,* 391 U.S. 543, 548–49, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968); see *United States* v. *Mendenhall,* 446 U.S. 544, 557, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed.

---

[16] We recognize that an exception occurs if the tenant has abandoned his interest in the leased premises or if the lease has terminated by means other than abandonment. See, e.g., *Feguer* v. *United States,* 302 F.2d 214, 249 (8th Cir.), cert. denied, 371 U.S. 872, 83 S. Ct. 123, 9 L. Ed. 2d 110 (1962). Our determination on the expectation of privacy issue that the trial court correctly determined that the defendant did not abandon the leased premises is the same on the issue of consent.

2d 1138 (1980). Consent is a question of fact to be evaluated under the totality of all the circumstances. *Schneckloth* v. *Bustamonte,* supra, 227; *Dotson* v. *Warden,* supra, 619. As a question of fact, it is to be decided by the trial court on the evidence it deems credible together with the reasonable inferences to be drawn from that evidence and its conclusions will stand unless they are clearly erroneous. Id.

The state recognizes that if it is found that the defendant had a reasonable expectation of privacy, it must prove that the consenting party "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."[17] *United States* v. *Matlock,* supra, 171; *Dotson* v. *Warden,* supra, 621. The state maintains in its brief that, by operation of the lease and the fact of the fire, the landlord had "a right to possession *superior* to that of the lessee." This claim goes as follows: construing the facts most favorably to the defendant the premises were untenantable but repairable within ninety days thereby implicating that portion of the lease (article eleventh)[18] which provides: "[T]he Landlord may enter and repair the same with reasonable speed, and the rent shall not accrue after said injury or while

[17] The search conducted by the police of the leased premises was hardly one of "inspection"; see *Marshall* v. *Barlow's, Inc.,* 436 U.S. 307, 311–13, 98 S. Ct. 1816, 56 L. Ed. 2d 305 (1978); *Camara* v. *Municipal Court,* 387 U.S. 523, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967); but was, as the court specifically found, "for the sole purpose of searching for and obtaining evidence of arson."

[18] Article eleventh of the written lease provided in part: "Should the demised premises be rendered untenantable and unfit for occupancy, but yet repairable within ninety days from the happening of said injury, the Landlord may enter and repair the same with reasonable speed, and the rent shall not accrue after said injury or while repairs are being made, but shall recommence immediately after said repairs shall be completed . . . ." In its memorandum

repairs are being made, but shall recommence immediately after said repairs shall be completed." The state's claim continues, arguing that "obviously" the defendant was no longer in "exclusive possession"[19] after the fire and he was not required to pay rent. Under the lease, the landlord was given, it continues, "an absolute right to temporary possession to perform certain activities" such as "the necessity to gut the premises to make necessary repairs . . . [the] need to bring in workmen, subcontractors, etc. . . ." Asserting that the "landlord's interest and peculiar relationship with the object of the search was obvious and unique," the state submits that this was not a "general exploration of the premises" of a tenant such as is generally condemned; but rather it was for an air sample and the removal of charred rug for the "limited purpose of determining the cause of the fire which had recently done so much damage to his property." Therefore, the state contends that "[h]is consent to the entry of those public officials charged with determining the cause of fires would appear to be the most reasonable and appropriate course of action in light of all the circumstances and the leases."[20]

---

of decision the trial court made no express finding of untenantability under the lease nor did it find that the landlord's entry on February 23, 1977, was made for repair. The court's memorandum contains no finding that the defendant entered the premises after the fire for the purpose of repairing them under the lease. Moreover, the court explicitly found that the landlord asked for a full month's rent for March, 1977, from the defendant.

[19] The state does not point to any provision in the lease that mentions "exclusive possession" eo nomine nor do we find any.

[20] The state refers to *Michigan* v. *Tyler*, 436 U.S. 499, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978), decided by the United States Supreme Court after the fire of February 14, 1977. In *Tyler*, that court held, inter alia, that once having entered a building to extinguish a blaze, officials can remain therein for a reasonable time in order to investigate the cause of the fire. "Thereafter, additional

The defendant argues that this warrantless search of his nonabandoned leased business premises eleven days after the fire was extinguished violates his fourth amendment protection against. unreasonable searches and seizures. He also argues that this search, which was for evidence of a crime, does not fall within any exception to the warrant requirement of the fourth amendment and especially that recognized where a proper third party may give a valid consent to search.

"While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated . . . property rights are neither the beginning nor the end of [this court's] inquiry." *United States* v. *Salvucci,* 448 U.S. 83, 91, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980). "The test applicable to third-party consent requires the state to prove that the consenting party 'possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.' *United States* v. *Matlock,* 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). *Matlock* (p. 171) goes on to elaborate in a footnote on what constitutes 'common authority.' 'Common authority is, of course, *not to be implied from the mere property interest a third party has in the property.* The authority which justifies the third-party consent does not rest upon the law of property, with its attendant his-

---

entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches." (Citations omitted.) *Michigan* v. *Tyler,* supra, 511–12. The fact that *Tyler* was decided after the fire in this appeal is not critical on this appeal. The intrusion complained of was by governmental officials, both police and fire, searching for evidence of a crime. The fourth amendment applies fully just as if *Michigan* v. *Tyler* had not been decided.

torical and legal refinements,[21] see *Chapman* v. *United States*, 365 U.S. 610 [81 S. Ct. 776, 5 L. Ed. 2d 828] (1961) (landlord could not validly consent to the search of a house he had rented to a another), *Stoner* v. *California*, 376 U.S. 483 [84 S. Ct. 889, 11 L. Ed. 2d 856, reh. denied, 377 U.S. 940, 84 S. Ct. 1330, 12 L. Ed. 2d 303] (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on *mutual use of the property* by persons generally having *joint access or control for most purposes,* so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.' " (Emphasis in original.) *Dotson* v. *Warden,* supra, 622. Adopting a functional approach to this fourth amendment issue, the consent exception reflects a fair accommodation between constitutional requirements and the encouragement of effective law enforcement with the resolution to be made under the facts and circumstances of each case.

To begin with, the landlord clearly did not, as the state asserts, have, under the facts and the lease, a "superior" right of possession.[22] The trial court made no finding that the premises were untenantable and repairable within or without a ninety day period.[23] The landlord did not repair the prem-

---

[21] For this reason, the reliance merely upon the provisions in the lease in the dissenting opinion is misplaced. It is the *use* of the property that is controlling, not the potential right to use.

[22] The analysis in the state's brief on the consent issue draws on what it argues were the landlord's rights under the lease.

[23] The closest thing to such an assertion is the court's statement that "[t]he premises suffering extensive damages rendering them unfit for occupancy." The court did not, however, relate it to the provision upon which the state relies here.

ises within ninety days. The defendant and he both cleaned them. Although the rent was paid through February, the landlord, in contradiction to the lease provision upon which the state relies, not only demanded the rent for March but never pursued his option to "repair" by February 23. The landlord never asked the defendant to surrender the premises. Thus, in the circumstances of this case in ending the lease, the landlord's right to possession was hardly "superior" to that of the defendant.

A fair reading of the trial court's memorandum discloses that it concluded that the landlord's consent on either the "common authority" or "other sufficient relationship" criteria of *Matlock* had not been proven by the state. We agree. The landlord took no action to terminate the defendant's possession under the lease; he permitted the defendant's property to remain and demanded another month's rent. He did not demonstrate that he curtailed the defendant's access; he even left the leased premises upon the defendant's asking him to do so several days prior to February 23.[24] It is true that the landlord caused the premises to be boarded up initially and entered the premises on several occasions after the fire. There was, however, no evidence that he exercised his "absolute right to temporary possession" as the state suggests concerning "the necessity to gut the premises to make necessary repairs and the corollary need to bring in

[24] Zindros testified that this occurred when he (Zindros) and his insurance agent were on the premises concerning a settlement at which time the landlord was making "a little disturbance"; "He [the landlord] was hollering. He was asking for the March rent." The defendant also said that at that time the landlord was not there cleaning the premises nor was he doing any work there.

workmen, sub-contractors, etc . . . ."[25] The defendant had not abandoned his possession. In addition, the court properly found that any right to inspect under the lease[26] could not be enlarged here to authorize consent to officers to enter to gather evidence of a crime by the defendant. 2 LaFave, Search and Seizure § 8.5(a), p. 739; see *Chapman* v. *United States, supra,* 616; *State* v. *Hodges,* 287 N.W.2d 413 (Minn. 1980).[27]

The defendant was not contacted concerning giving any consent to this search. He lived in Waterbury and the police and fire officials involved knew he was there. He had not fled nor is it claimed he was likely to do so and this was eleven days after the fire. See *Chapman* v. *United States, supra,* 615. Only one day prior to the search, the landlord had seen the defendant when the latter had brought a check for property taxes to the landlord's home. The landlord knew his consent was

---

[25] See articles tenth, eleventh, and twenty-fourth of the lease, set out above.

[26] See article tenth of the lease, set out above.

[27] Judge Spada's dissent points out that "[u]nder the lease, the landlord reserved to himself the right of access and entry upon the occurrence of a major fire." If we assume, arguendo, as he says, that "[t]his reservation was broad enough to allow for appraisal of damage; the opportunity to repair and relet; and finally to locate and abate a suspected cause of the fire," such rights cannot be the basis for extending authority to the landlord to authorize a warrantless search of the premises by the police for criminal evidence in this case. This proposition was rejected in *Chapman* v. *United States,* 365 U.S. 610, 616, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961), which Judge Spada endeavors to distinguish by stating that there was no relevant lease provision in *Chapman.* No basis exists for such a distinction. The premise for the holding in *Chapman* was that property law should not control protections afforded by the fourth amendment. Similarly, contract law cannot be utilized here to control the defendant's constitutional rights. To conclude otherwise would cause Zindros' fourth amendment rights to be subject to, at the very least, the loosely fettered discretion of his landlord.

not for a mere civil or administrative search but for evidence of a crime; he said "they wanted to take evidence." It is true that a "co-owner" has been said to have the authority to permit the search of a jointly held possession. *Frazier* v. *Cupp,* 394 U.S. 731, 740, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969); *Jackson* v. *Official Representatives & Employees of Los Angeles Police Department,* 487 F.2d 885, 886 (9th Cir. 1973). This case, however, is not one of co-ownership. Nor is it one of joint or mutual use of that quality that pushes fourth amendment protections into the exception of consent.[28]

The state next argues that even if the landlord had no actual authority to consent, the search was

---

[28] The dissenting opinion by Justice Shea asserts that this case is similar to *United States* v. *Botsch,* 364 F.2d 542 (2nd Cir. 1966). The court in that case, however, acknowledged that it was distinguishable from landlord consent cases because the landlord's "activities—though innocent—were inextricably intertwined with Botsch's alleged scheme and cast suspicion upon him . . . ." Id., 548. Courts that have cited the *Botsch* case have consistently noted this distinction. See *United States* v. *Diggs,* 544 F.2d 116, 120 (3d Cir. 1976) (the "right to exculpate oneself decisively distinguished [Botsch] from [the searches] condemned in the so-called 'hotel cases'"); *United States* v. *Gargiso,* 456 F.2d 584, 587 (2d Cir. 1972) ("Here, as in *Botsch,* and unlike in *Stoner* v. *California,* 376 U.S. 483, 84 S. Ct. 889, 11 L. Ed. 2d 856 [reh. denied, 377 U.S. 940, 84 S. Ct. 1330, 12 L. Ed. 2d 303] (1964) . . . the landlord—with access to and interest in an area . . . has a right quickly to exculpate himself from suspicion."); *United States* v. *Cataldo,* 433 F.2d 38, 40n (2d Cir. 1970), cert. denied, 401 U.S. 977, 91 S. Ct. 1200, 28 L. Ed. 2d 326 (1971); *United States* v. *Poindexter,* 325 F. Sup. 786, 791 (S.D.N.Y. 1971); *Gieffels* v. *State,* 590 P.2d 55, 61 (Ala. 1979); *Commonwealth* v. *Latshaw,* 481 Pa. 298, 308n, 392 A.2d 1301 (1978), cert. denied, 441 U.S. 931, 99 S. Ct. 2050, 60 L. Ed. 2d 659 (1979). Here, unlike in *Botsch,* we have noted that it was the defendant who was a suspect at the time that Cipriano consented to the entry. There was no testimony that Cipriano consented to the entry on the basis of trying to exculpate himself from suspicion. Therefore, the *Botsch* case is inapplicable to the facts in the present case.

still reasonable under the fourth amendment because there was "apparent authority" for the search. It goes on to claim that, in measuring the facts of this case against the apparent authority doctrine, one must conclude that the officers acted in the "reasonable and good faith belief" that consent had been obtained from the proper party.[29]

The defendant claims that the record does not contain facts sufficient to justify the search on the doctrine of "apparent authority" which, in turn, would be necessary to support the state's claim that the officers' action based on that authority establishes a reasonable good faith belief by them that validates the search.

In pressing its line of argument the state points to the following circumstances: Cipriano owned the building, the premises had been "gutted" by fire, he (and not the defendant) had secured the premises after the fire and he opened the premises for the fire marshal on the Monday after the fire. It also claims that the defendant's attorney called the landlord to gain access to the building.[30] The defendant argues that the police were not at all mistaken as to the essential facts. They knew that Cipriano owned the premises but that it was currently occupied by the defendant. Detective Lieutenant Solomita was one of the two officers

---

[29] We note that the trial court's memorandum of decision does not address either the claim of "apparent authority" or "reasonable good faith belief," although the parties briefed and argued both issues in this court. The defendant has not claimed that these issues were not raised in the trial court.

[30] The evidence was conflicting as to when this occurred with reference to the date of the search; in any event, the court made no finding on this circumstance. The state points to no evidence that this was known to the officers before their February 23 entry so as to contribute to the interrelated claim of "apparent authority" and "reasonable good faith belief."

dispatched to Cipriano's home to seek his consent to enter the premises; Solomita lived in the area of the defendant's pizza business and had even been a patron there prior to the fire.[31] At that time Solomita knew the defendant was a suspect. When they entered for the search, after Cipriano pried off the plywood on the front door, the defendant's equipment was still there; they initially saw it there eleven days earlier when police and fire officials were there with the defendant as well as Cipriano. He stresses the lack of exigent circumstances stating that the fire had long since been extinguished.

In *Stoner*, the United States Supreme Court said that "the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency by unrealistic doctrines of 'apparent authority.' " *Stoner* v. *California*, supra, 488. Some courts have refused to suppress evidence obtained as the result of a reasonable good faith belief that permission was given by one with the actual authority to consent to a search. See *People* v. *Adams*, 53 N.Y.2d 1, 8–9, 422 N.E.2d 537 (1981), and cases there cited. The rationale for this approach has been said to derive from the fact that the fourth amendment protects against unreasonable searches and seizures and, therefore, "if the police are acting in a reasonable fashion in response to the circumstances with which they are confronted, then an error in judgment in failing to ascertain the actual authority of the person to consent should not give rise to an unreasonable search." *People* v. *Adams*, supra, 9. It is true that implicated in this

---

[31] Solomita testified that he and Detective Gary went to Cipriano's home for this purpose. Gary, who was among the officers who entered the premises on February 23, did not testify at the hearing on the motion to suppress.

rationale is the purpose of the exclusionary rule. That rule was designed "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures" and not primarily to vindicate the individual's constitutional right. *United States* v. *Calandra,* 414 U.S. 338, 347, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974); *People* v. *Adams,* supra, 9. We do not dispute, assuming we adhered to the rule the state urges us to adopt, the view that application of the exclusionary rule in a case where there existed reasonable good faith reliance by the police would do little in discouraging improper police conduct. We deem relevant, at this point, the following language from *Adams*: "We emphasize that the police belief must be reasonable, based upon an objective view of the circumstances present and not upon the subjective good faith of the searching officers. Moreover, a warrantless search will not be justified merely upon a bald assertion by the consenting party that they possess the requisite authority. Nor may the police proceed without making some inquiry into the actual state of authority when they are faced with a situation which would cause a reasonable person to question the consenting party's power or control over the premises or property to be inspected. In such instances, bare reliance on the third party's authority to consent would not be reasonable and would, therefore, subject any such search to the strictures of the exclusionary rule." *People* v. *Adams,* supra, 9–10; see *People* v. *Wagner,* 114 Mich. App. 541, 548–49, 320 N.W.2d 251 (1982). If we apply these principles to this case, the trial court could have reasonably concluded that the officers did not demonstrate the necessary reasonable good faith belief under the

circumstances.  Therefore, we need not decide whether such an exception to the exclusionary rule exists.[32] The state does not claim that there was no evidence upon which the trial court could base the decision it reached, but rather that the result was erroneous under the applicable law.  It is correct that the evidence was often in conflict and, arguably, the decision was a close judgment call, but credibility is still the province of the trier.  Assuming arquendo that probable cause existed for the issuance of a warrant on February 13, as the state argued before us, we must observe that courts have strongly supported the preference to be accorded searches under a warrant and have explicated that a doubtful or marginal case with a warrant may be sustainable where one without it would fail.  See,

[32] The state urges us to adopt the view of *United States* v. *Williams,* 622 F.2d 830, 847 (5th Cir. 1980), cert. denied, 449 U.S. 1127, 101 S. Ct. 946, 67 L. Ed. 2d 114 (1981), and to adopt such an exception.  In *United States* v. *Williams,* supra, the arresting drug enforcement agent recognized "with certainty" that the defendant was in violation of her bail limitations under the statute imposing travel restrictions upon her.  18 U.S.C. § 3146.  That court, deciding that the agent acted on the good faith belief that the defendant's conduct was in violation of statute, found that suppression of heroin found in an incidental search was not required whether or not her violation of the bond limitation warranted her arrest and consequent searches.  In applying the good faith exception in *Williams* that court said: "A good-faith mistake about the legal intricacies of bail jumping would not require exclusion of that heroin found in an incidental search." *United States* v. *Williams,* supra, 846.

Adverting to *Williams,* the state claims that the good faith of the officers in this case must be evaluated "in light of apparently valid provisions of the General Statutes authorizing entry of the type made here.  Conn. Gen. Statutes Secs. 29-49 and 29-52."  Once again we note that the trial court did not address this claim and yet, on the record before us, no motion to rectify was made by the state; Practice Book § 3082; and we note that the defendant has not briefed or argued this claim although the state has.

General Statutes § 29-49, as it was on February 23, 1977, provided that "the local fire marshal shall, within two days, not including

e.g., *United States* v. *Ventresca,* 380 U.S. 102, 106, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965); *Jones* v. *United States,* 362 U.S. 257, 270, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960); *State* v. *Bember,* 183 Conn. 394, 412, 439 A.2d 387 (1981); *State* v. *Jackson,* 162 Conn. 440, 445, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972). One of the purposes of the warrant requirement "is to prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure." *United States* v. *Martinez-Fuerte,* 428 U.S. 543, 565, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976). Just as a search cannot be justified by the potent evidence it produces, so also an unlawful search cannot be justified by claiming that the evidence seized might have been obtained by other and lawful means. *United States* v. *Mancusi,* 379 F.2d 897, 903 n.9 (2d Cir. 1967), aff'd sub nom. *Mancusi* v. *DeForte,* 392 U.S. 364, 88 S. Ct. 2120, 20 L. Ed. 2d 1154 (1968). The state has not shown, as it must,

---

Sunday, of the occurrence of any fire within his jurisdiction . . . investigate the cause, origin and circumstances of such fire, and especially investigate whether such fire was the result of carelessness, design or any criminal act, and for the purpose of such investigation may enter into and upon the premises where the fire occurred . . . and examine the same . . . ." If we assume that the entry on February 13, 1977, was pursuant to this statute, it is hardly any justification for the entry on February 23, 1977—a lapse of eleven days during which the record discloses no meaningful pursuit of that investigation in the interval.

General Statutes § 29-52, it appears, requires periodic inspections and permits entry for the same. It also provides for entry in an emergency. No serious claim can be made that the entry of February 23, 1977, was an "inspection" pursuant to this statute or that it was pursuant to an emergency—which latter circumstance has been expressly disclaimed by the state.

Therefore, we need not even decide whether such an exception should exist in this jurisdiction because we have already decided that the belief of the officers that the search was proper was unreasonable under the circumstances. See *Riley* v. *Gray,* 674 F.2d 522, 528-29 (6th Cir. 1982).

that the trial court's conclusions in this case were "clearly erroneous." See *State* v. *Ostroski,* supra; *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra; Practice Book § 3060D. It follows from what we have said that this search and seizure was "unreasonable" under the fourth amendment.

There is no error.

In this opinion SPEZIALE, C. J., and PETERS, J., concurred.

SHEA, J. (dissenting). In my view the majority opinion constitutes a wholly unwarranted and unprecedented application of the fourth amendment which serves as a kind of reductio ad absurdum to denigrate its salutary purpose. The opinion completely overlooks the legitimate interest of a landlord, whose building has been the subject of a suspected arson, in enlisting the aid of the police for the purpose of determining the cause of the conflagration, despite unambiguous lease provisions providing him a right of access in such an event.

Under the terms of the lease the landlord had a general right to enter the premises in order to inspect them and also to make necessary repairs. He also had a more specific right to enter and repair in the event of a fire. These provisions must be construed to authorize the landlord to inspect the premises for the purpose of ascertaining the cause of a fire before proceeding to repair the damage caused by the fire. Whether the suspected cause was defective wiring or arson by the tenant, the landlord would have a sufficient interest in the protection of his property to justify an investigation for the purpose of determining the origin of the fire. Since the landlord had such a right to

enter in order to find out the cause of the fire, he could authorize others, including the police, to do the same thing. If the tenant could not stop the landlord from making such an investigation, he had no right to object to the same investigation when it was conducted by the police under authority from the landlord.

The difference between this case and the cases involving permission of the owner to enter a hotel room or other premises occupied by another is that here the owner had an interest based upon his status as a landlord in determining the cause of the fire and a right of entry reserved in the lease broad enough to entitle him to do so. These circumstances negate any reasonable expectation of privacy on the part of the tenant.

The case is similar to *United States* v. *Botsch,* 364 F.2d 542 (2d Cir. 1966), where a landlord, who had been an unwitting accomplice in a fraudulent scheme utilizing the mails, invited postal inspectors to search a shanty which he had leased to the defendant. It was held that his interest in clearing himself from the taint of suspicion, which had been cast upon him because of his innocent participation in the cunning swindle concocted by the defendant, authorized him to allow the search. Id., 547–48. Here also the landlord had a legitimate interest in ascertaining the cause of the fire and, in addition, an express right of entry broad enough to authorize him to make an investigation for that purpose. Since the search conducted by the police did not exceed the scope of the authority vested in the landlord who had consented thereto, it was not unreasonable and did not violate the rights of the defendant under the fourth amendment.

SPADA, J. (dissenting). I must respectfully disagree with the majority decision.

This is an appeal from a suppression order by the trial court invalidating, on constitutional grounds, the warrantless search of a fire-damaged building under lease to the defendant for his use as a restaurant.

The facts on appeal raise two issues: (1) whether the landlord, as a third party, had authority to consent to a police search of the building after the fire, and (2) whether the defendant's legitimate expectation of privacy was violated by the challenged search.

The threshold question in every suppression case is the existence of a reasonable expectation of privacy in the area searched. "[The] capacity [of a defendant] to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas* v. *Illinois,* 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387, reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1978). The test for legitimate expectation of privacy is: (a) has there been a subjective expectation exhibited; and (b) is the expectation one society will recognize as reasonable. *Smith* v. *Maryland,* 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979).

The lease (paragraph 11) provided in relevant part that "[s]hould the demised premises be rendered untenantable and unfit for occupancy . . . the Landlord may enter and repair the same with reasonable speed . . . ." It was undisputed that as a consequence of the February 12, 1977 fire, the premises were rendered unfit for occupancy.

On February 13, the landlord secured the premises by boarding them, thereby protecting both his and the defendant's proprietary interests. A new door, required for access, was installed by the landlord. On February 14, the defendant permitted officials of the Waterbury fire marshal's office to inspect the premises. On three separate occasions after the fire the landlord entered upon the premises for his own purposes.

The defendant testified that he assumed the lease was terminated by the fire but that he could stay to the end of February because his monthly rent had been paid. Both the landlord and the defendant removed debris and cleaned the premises. The defendant made no repairs and eventually removed his salvageable restaurant fixtures. The claimed tainted search occurred on February 23, eleven days after the fire, when the landlord granted access to fire and police officials to search the premises, without a warrant, to ascertain the cause of the fire.

We are not reviewing herein the case of a landlord authorizing a search of his tenant's property. *Chapman* v. *United States*, 365 U.S. 610, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961). Under the lease, the landlord reserved to himself the right of access and entry upon the occurrence of a major fire. This reservation was broad enough to allow for appraisal of damage; the opportunity to repair and relet the premises; and finally to locate and abate a suspected cause of the fire. The early payment of the February rent neither altered nor reduced the landlord's contractual right to enter upon the premises. The majority decision limits the landlord's right of access to the time of the fire or within

a reasonable period thereafter. No authority or precedent exists to justify the restriction of the landlord's contractual right of access.

In *Michigan* v. *Tyler,* 436 U.S. 499, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978), cited by the majority, the warrantless search resulted after a fire without the intervention or presence of a landlord or third party. This precedent therefore is unpersuasive in an instance of third party consent, such as in the case before us.

The exigency of the fire triggered the landlord's right of access bargained for and contained in the lease. The landlord's right of unrestricted access effectively negated the defendant's reasonable expectation of privacy. Because the landlord's claim to possession was at minimum equal to that of the defendant, he had an independent right to permit the search.

The burden rests on one who seeks to suppress to prove that his legitimate expectation of privacy has been violated by the challenged search. *United States* v. *Bellina,* 665 F.2d 1335 (4th Cir. 1981). The evidence does not reasonably establish that the defendant exhibited any subjective expectation of privacy in the fire damaged restaurant; nor can I conclude that society would recognize any such expectation as reasonable. "Not all places enjoy, in the eyes of society and the law, the same legitimate or reasonable expectation of privacy." *United States* v. *Bellina,* supra, 1340; see also *United States* v. *Rucinski,* 658 F.2d 741, 746 (10th Cir. 1981), cert. denied, 455 U.S. 939, 102 S. Ct. 1430,

71 L. Ed. 2d 649 (1982), making a distinction between private houses and commercial property for fourth amendment purposes.

I would reverse the trial court's ruling on the motion to suppress.